NEIL McNEIL *vs.* BOSTON CHAMBER OF COMMERCE.

Suffolk.   March 17, 1891. — September 1, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Corporation — Oral Agreement — Building Committee — Power of Majority — Ostensible Authority.*

In an action against a corporation for breach of an agreement to employ the plaintiff as the lowest bidder to erect a building, it appeared that a building committee of five, appointed by the defendant's directors to procure plans and specifications and to make all contracts therefor subject to the directors' approval, sent to selected builders plans and specifications with a "Notice to Bidders" attached, containing the terms of the bidding, and reserving the right

to reject any and all bids. All the builders save one declining to submit bids, a conference was held between them and four of the committee. There was evidence, which was contradicted, that among other changes the committee orally agreed to accept the lowest bid, in case the building was erected substantially in accordance with the plans and specifications submitted, without reserving the right to reject bids in that case; and that the fifth member subsequently assented to this agreement. There was also evidence that the committee assumed to make changes in the terms of the competition at its own will, and that the directors, though informed of their proceedings, and holding monthly meetings as a board, did not object to their action, nor inform the bidders that they could not safely deal with the committee. *Held*, that a finding was warranted that such an oral agreement, varying the terms of the notice to bidders, was entered into by the committee; and that such an agreement was within their ostensible authority, and was valid.

A committee appointed by the directors of a private corporation to erect a proposed new building therefor may act by a majority.

CONTRACT, for breach of an alleged agreement to employ the plaintiff as the lowest bidder to erect the new Chamber of Commerce for the defendant, which agreement was entered into with him by a building committee appointed under the following vote, passed on October 9, 1889, by the defendant's stockholders: "Voted, that a committee of five be appointed by the chairman of this meeting, of whom the president shall be one, with full powers and authority to procure plans and specifications for a building, and make all contracts for the erection and completion of the same, subject to the approval of the directors." At the trial in this court, before *Holmes*, J., the jury, as requested by the judge, assessed the amount of the plaintiff's damages, and answered in the affirmative the following questions submitted to them:

" 1. Did the committee on building purport to make a contract on behalf of the defendants by which they agreed to accept the lowest bid in case the building was built substantially in accordance with the plans and specifications submitted, without reserving the right to reject bids in that .case? 2. If such contract was made, was it approved by the directors? 3. If such contract was made, was it within the ostensible authority of the committee? 4. Was the building, as finally contracted for, a building substantially in accordance with the said plans and specifications? "

The judge thereupon directed a verdict for the defendant, and reported the case for the consideration of the full court. If the

direction was wrong, judgment was to be entered for the plaintiff for the amount of damages found by the jury.

The case was argued at the bar in March, 1891, and afterwards, in June following, was submitted on the briefs to all the judges.

*R. M. Morse, Jr.,* ( *C. E. Hellier* with him,) for the plaintiff.

*R. Stone,* for the defendant.

ALLEN, J.   There was sufficient evidence to warrant the finding that the members of the committee on building, who were present at the conference of March 15, 1890, purported to make a contract on behalf of the defendant, by which they agreed to accept the lowest bid, in case the building was built substantially in accordance with the plans and specifications submitted, without reserving the right to reject bids in that case. The presiding justice, in his charge to the jury, called attention to the distinct difference in the testimony introduced on the one side and on the other.   Five different builders had been selected by the architects and the building committee of the defendant, to whom written notices had been sent requesting bids for the defendant's proposed new building.   To each of these a copy of the specifications was afterwards delivered, to which was attached a "Notice to Bidders," containing the terms of the bidding.   After an examination of these documents, four of the selected builders declined to submit bids.   A conference was thereupon invited and had between the builders and the building committee, at which there was a full discussion, and certain changes from the terms of the notice to bidders, and from the specifications, were agreed upon ; and the builders agreed to submit bids.   In respect to one particular, which has become material, the testimony is somewhat at variance respecting the result of this conference.   The notice to bidders contained the two following provisions : "The work to be let to the lowest and best bidder, upon his executing to the Boston Chamber of Commerce a good and sufficient bond," etc.   "The building committee of the Chamber of Commerce reserves the right to reject any and all bids."   These provisions were the subject of discussion at the conference.   All the witnesses agree that the words "and best" were to be struck out of the first clause.   The plaintiff contends that the last clause was modified by an agreement

that, in case the building should be erected substantially in accordance with the plans and specifications then submitted, the contract should be given to the lowest bidder among the five selected builders. The defendant contends that the committee only agreed to give the contract to the lowest bidder among the builders, if any of their bids under that competition should be accepted; but that they did not surrender the right to reject all of the bids and open a new competition. The plaintiff offered testimony tending to support his view, which was met by testimony offered by the defendant tending to support the contrary view. This testimony was all submitted to the jury, under instructions to which no exception was taken; and their verdict sustained the view contended for by the plaintiff.

There can be no doubt that it was competent in law for the parties by an oral agreement to vary the terms of the notice to bidders. This would be so, even if that notice had expressed the terms of a concluded contract. *Bartlett* v. *Stanchfield*, 148 Mass. 394. But it was only a proposal, which was never accepted as it originally stood; and it is not contended that there was anything in the nature of it to make it legally impossible for the final contract between the parties to be expressed and represented partly by the writing, and partly by additions or changes orally agreed to.

The defendant, however, contends that an examination of the evidence shows clearly that both parties to the conference understood that the terms on which bids should be invited were to be expressed in writing, and that they were then and there undertaking to do no more than to settle the terms in which a future invitation should be expressed; so that the notice to bidders, subsequently sent, must be taken to embody all the terms upon which the bids were to be made. This proposition is controverted by the plaintiff, and it does not seem to us that it can be said to be clearly established. No witness testified that there was to be a new written or printed notice embodying the new terms which had been settled upon. No one of the builders testified that he accepted the new notice as having the effect contended for by the defendant. On the other hand, the plaintiff testified that he did not think he read it, but did not remember. The specifications attracted his chief attention. Mr. Woodbury

(another of the competing builders) testified that he did not remember whether there was any change in the notice to bidders. The several builders apparently proceeded with their estimates without waiting for any new statement of terms, and when it came, no one of them appears to have treated it as embodying all the terms of a new proposal for bids.   Indeed, it plainly did not do so.   One of the terms upon which there was no dispute was that the bids should be opened in the presence of all the bidders. There was a reason for insisting on this stipulation.   The original notice to bidders provided for a delivery of the bids signed and sealed to the architects ; but there was a distrust of the fairness of the architects.   Mr. Lothrop, (still another of the five builders,) in his letter of March 12, 1890, declining to submit a bid under that notice, mentioned as one objection that the proposals should be opened in the presence of the bidders.   At the conference this letter was read, and this stipulation, according to the testimony of the plaintiff and of Mr. Lothrop, was expressly agreed to, and no witness said anything to the contrary.   All agreed that the letter was read, and its objections commented on, one by one.   Nor does it appear that the terms of the new notice were fixed by the committee.   The plaintiff asserts that it was prepared by one of the architects, who was not present at the conference.   So far as it appears, the jury might properly find that both the committee and the builders rested upon what had been said and done at the conference.

The defendant further contends, that the building committee were joint agents of the defendant, and that the four members who were present at the conference of March 15 could not execute the power which was delegated to the whole committee, consisting of five members, jointly.   It does not clearly appear that this point was taken at the trial, and it is not noticed in the charge of the presiding judge ; but we have considered it.   Where special agents are appointed to act jointly in the execution of a particular power, it has often been held that the action of all is necessary, in order to execute the power properly.   This rule, however, is subject to many qualifications or exceptions.   It is well understood that public agents may usually act by a majority. So also it has been settled that a majority of the directors of a corporation constitute a quorum, and a majority of the quorum

may act. *Sargent* v. *Webster*, 13 Met. 497, 504. *Edgerly* v. *Emerson*, 23 N. H. 555. *Wells* v. *Rahway White Rubber Co.* 4 C. E. Green, 402.

Generally speaking, a committee of a corporation is subject to the same rules as the directors. *State* v. *Jersey City*, 3 Dutch. 493. *Junkins* v. *Union School District*, 39 Maine, 220. It would be very inconvenient in practice if a committee of this character, whose duties involve many acts in carrying out the general purpose of their appointment, could do nothing if a single member should be absent. There is sufficient precedent for holding that a majority may act, and such is the better rule. *Kupfer* v. *South Parish in Augusta*, 12 Mass. 185. *Damon* v. *Granby*, 2 Pick. 345. *Hayward* v. *Pilgrim Society*, 21 Pick. 270, 275, 277. *Haven* v. *Lowell*, 5 Met. 35, 42. *Weymouth & Braintree Fire District* v. *County Commissioners*, 108 Mass. 142. Moreover, there was evidence from which the jury might infer the assent of Mr. Speare, the absent member of the committee, to what was done by his associates. He went away, temporarily, to New Orleans, leaving the business in their hands. But on his return it expressly appears that he had a conference with them, or with some of them, and that they undertook to tell him what had been done. He denies, to be sure, that what they told him was in accordance with what the plaintiff contends, and what the jury have found to be the fact. The significant fact, however, that they undertook to tell him the result of the conference in respect to the right of the committee to reject any and all bids, is testified to by Mr. Speare. He says, " They told me they had expressly reserved that." If, in point of fact, the reservation of this right was accompanied with the qualification that they would accept the lowest bid in case they should build substantially in accordance with the plans and specifications submitted, the jury might think it a natural inference that at that time, before any controversy had arisen as to accepting the plaintiff's bid, Mr. Speare's associates told him all that had been agreed to on this head, though Mr. Speare had forgotten a part of it at the time of testifying. Mr. Lothrop's testimony tends to support such an inference. He said, " Before the meeting, I stated to Mr. Blaney (a member of the building committee) and Mr. Speare, that in my opinion the right to reject any and all bids passed [ceased?] after they had selected five

from the many mechanics who had been recommended; and I was assured by them that if any one of these parties whom they had selected, and whom they supposed to be responsible, should be the lowest bidder, his bid would be accepted, and it was on that condition that I estimated, and I should not have figured on any other." He further testified, that in a private conversation, perhaps a different one, before that meeting, Mr. Speare said he would not consent to give up the right to reject all bids. It is further to be observed, that the chief reason assigned by the members of the committee who were present at the conference why they did not wish to give up the right to reject any and all bids was, that they were not willing to be bound absolutely; that the cost of the building might be too much for their means, so that a substantial change of plan might be necessary, or possibly the erection of the building given up entirely; and that the lowest bid might be entirely above the views of the committee, so that they were unwilling to consent to accept it unconditionally. Mr. Speare himself testified that he gave to Mr. Lothrop two reasons why the committee would not give up the right to reject all bids. The first was, that the lowest bid might be a sum which the directors would not think advisable to spend to erect a building. The second was, that it was the directors who would be the final arbitrators whether the committee should award the contract, and therefore the committee would have no right to give up the right to reject any and all bids. Mr. Lothrop, on the other hand, testified very explicitly and in detail, that while Mr. Speare in conversation had mentioned the names of the committee to him, he (Mr. Lothrop) did not know then, nor at the time of testifying, whether the action of the committee must be approved by any other board or body. Looking at all the testimony, if the objection now urged had been distinctly presented as a question of fact at the trial, it must have been left to the jury to determine whether Mr. Speare assented to the terms of the contract, by which, as found by the jury, his four associates purported to agree to accept the lowest bidder, in case the building should be built substantially in accordance with the plans and specifications submitted. Their finding that the contract was approved by the directors must have involved the finding that it was approved by Mr. Speare.

And this finding might well be reached without implying any intentional misstatement on his part.

The remaining questions are whether there was sufficient evidence to warrant the second and third findings, or either of them, that such contract, if made by the committee, was approved by the directors, and was within the ostensible authority of the committee. If either of these was supported by the evidence, it is enough for the plaintiff's purposes, and most, if not all, of the evidence relating to the second finding bears also upon the third. The plaintiff contends that it was within the ostensible authority of the committee to fix the terms upon which it would receive bids, and to make the agreement which is embodied in the first finding of the jury without any reference to an approval by the directors. He urges that this was within the ordinary province of a building committee; and that in this instance the directors knew that there was to be a competition for bids, that this competition was to be limited to five selected builders, and that the committee would fix the terms of it; that the directors were well aware that the committee was going on to attend to all these matters; that a vote had already been passed by the directors, authorizing the committee to make leases in the new building; that they also knew that the architects had been selected; that the plans were hanging up in the office; that the erection of the new building was the most important subject which the board of directors or the Chamber of Commerce had under consideration during this period; that it was a subject of constant talk; and that no director ever objected to the committee's undertaking to fix the terms of the competition among the builders, or questioned its power to do so, till after a letter from the plaintiff's attorney threatening an action at law. There was testimony in support of these various propositions. So far as appears, no one of the bidders doubted the power of the committee to act in the matter. The committee assumed to make changes in the terms of competition at its own will. There is nothing to show any suggestion to any of the bidders in respect to the need of consulting the directors, except in Mr. Speare's testimony, already referred to, of his conversation with Mr. Lothrop. The notice to bidders held out the building committee as having the power to act in the premises. No mention of the

directors was made in it.   The board of directors had regular
monthly meetings.   Mr. Speare was president of the board, and
was upon the building committee.   He testified, "It was known
to the directors, in a general way, that specifications, notice to bid-
ders, and other details preliminary to obtaining bids and making
the contract, were being attended to by the committee and the
architects."   "Was it not the understanding of the directors
that there was to be a competition?"   "Yes, sir."   "How was
that known to them?"   "Simply in a general way; I presume
at a meeting of the directors I had told them."   He added later,
that the board of directors knew that the committee was trying
to get bids, and that no effort was made to inform bidders that
they could not safely deal with the committee.   According to
the strict letter of the original vote, the committee could not
even procure plans and specifications except subject to the ap-
proval of the directors.   It was allowed, however, not only to
procure plans and specifications, but to employ the architects
without formally consulting the directors.

Without dwelling further upon details of evidence, the jury
might properly find that the committee itself believed that it
was authorized to go on, as it did, without consulting the direc-
tors as to the details, and that the directors were aware in a
general way of what the committee was doing.   It seems to us
that the jury, as a result of the whole testimony, might prop-
erly come to the conclusion that the contract was within the
ostensible authority of the committee, and that the bidders had
a right to assume that the defendant would be bound by the
contract of the committee as to the terms of the bidding.

The doctrine as to ostensible authority is thus stated in
*Bronson* v. *Chappell*, 12 Wall. 681, 683: "Where one, without
objection, suffers another to do acts which proceed upon the
ground of authority from him, or by his conduct adopts and
sanctions such acts after they are done, he will be bound, al-
though no previous authority exist, in all respects as if the
requisite power had been given in the most formal manner."
Circumstances may warrant an inference that acts of a com-
mittee, openly done and extending over a considerable period of
time, were known and assented to by those who appointed the
committee.   The directors represented the corporation, and if

the directors knew and by silence acquiesced in the acts of the committee, that is enough. The vote of the stockholders would show what in the first instance was the actual authority of the committee, but the course of the directors might be considered in determining its ostensible authority. A secret or unknown limitation of authority imposed by the stockholders would not control an apparent authority from the directors, since the business was within the scope of the general authority of directors. This was clearly left to the jury by the presiding judge, in terms to which the defendant did not except, and which appear to be unexceptionable. The decisions cited by the plaintiff afford various illustrations of the application of the rule of law as to apparent authority in an agent. The rule itself is not open to doubt. *Fay* v. *Noble*, 12 Cush. 1, 17, 18. *Lester* v. *Webb*, 1 Allen, 34. *Ayer* v. *R. W. Bell Manuf. Co.* 147 Mass. 46. *Insurance Co.* v. *McCain*, 96 U. S. 84. *Mining Co.* v. *Anglo-Californian Bank*, 104 U. S. 192. See also *Case* v. *Bank*, 100 U. S. 446, 454. The defendant does not now insist that the evidence did not warrant the fourth finding of the jury.

The result is, that there should be,

*Judgment for the plaintiff on the finding.*