ERASTUS M. NASH, trustee, & others, *vs.* MINNESOTA TITLE
INSURANCE AND TRUST COMPANY.

Suffolk.  May 25, 26, 1893. — July 22, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Deceit — False Representations — Statements of Facts — Opinion — Agency —
Evidence for the Jury — Right of Officers to bind Corporation by Represen-
tation — Letters as Evidence.*

Thirteen actions for deceit were tried together, founded on alleged false represen-
tations of a title insurance and trust company, contained in a letter to A., pre-
pared by its counsel and trust officer, and signed by the company by its president,
who had the general supervision of its business, stating that the company had
the original documents printed in the advertisements of A.'s bonds, secured by
mortgage to the company as trustee upon the B. tract of land ; that it indorsed
the estimates of value contained therein made by parties named, "all of whom
are known as men of integrity and sound judgment touching local real estate
value"; that the fact that the company considered the title good in A. appeared
from its agreement to issue its policies of title insurance to the several holders
of A.'s mortgage to a certain amount, "fully protecting such holders against loss
or damage arising from any defect in said title or prior encumbrance thereon ";
and that from its knowledge of the mortgaged property, and from the situation
and prospects of the property, the company was of opinion that the mortgaged
property was adequate security for the amount of the proposed loan.  The mort-
gage was by A. to the company as trustee to secure the payment of bonds to a
large amount designed to be sold for B., who had conveyed the land to A. for an
expressed large consideration.  The documents referred to in the letter were
certificates giving estimates of the value of the property, signed by the parties
named.  There was evidence tending to show that the land was not worth more
than from a twelfth to a fifth of the estimates, that A. was of no pecuniary re-
sponsibility, and that the making of the bond and mortgage was a scheme of B.
and A. to defraud purchasers of the bonds.  Each of the several plaintiffs bought
some of the bonds, having first read the letter and the advertisement recommend-
ing the property and containing copies of the several certificates of value.  There
was evidence that the trust officer and president did not believe that B. and A.
were acting otherwise than in good faith, or that the property was insufficient
security, and there was evidence on which the plaintiffs relied to show that the
trust officer and president must have believed that the land was of much less
value than the amount of the bonds, and that the most important statements of
the letter were untrue.  The bonds purported to be first mortgage bonds, but
there was a prior mortgage of $30,000 on the property, of which the company's
officers were aware.  *Held,* that the company was not liable for representations
in the letter purporting to be merely expressions of opinion, but that it was liable
for the false representation in regard to the title, and for that only, to those of
the plaintiffs to whom it was made, and who were induced by it to invest in the
bonds.

Thirteen actions of deceit were tried together, founded on alleged false representations of a title insurance and trust company contained in a letter intended to be used by A., to whom it was addressed, in selling bonds secured by mortgage of land of A. to the company as trustee. A. was expected to show the letter to those who might become purchasers, and to use it as an inducement to them to purchase. The evidence seemed to indicate that A. sold to but one of the plaintiffs, K., or perhaps to him and three others; but it appeared that the company issued its policy of title insurance to each purchaser upon being paid $1 for each policy after the first; that the plaintiffs received such policies; that K. submitted the letter and the printed circulars to his customers, including all of the plaintiffs, who suggested that if the bonds could be made payable to order they would like some of them; and that A. reported that this could be done. K. testified that he paid for the bonds on delivery, and that his commission was taken out before payment. *Held*, that the representations were made to all persons to whom the letter was shown by A., as much as if it had been addressed to them by name; that K. was one of such persons; that the letter was not intended to be used by purchasers from A. to aid them in selling to others; that there was evidence for the jury in favor of all the plaintiffs as to whether they bought of A. through K. as agent; that, if they did, the representations were made to them, but not if A. first sold to K. and K. sold on his own account to the other plaintiffs; and that there was evidence for the jury in favor of all the plaintiffs as to whether the false representations of the company induced them to buy.

A corporation legitimately acting as the trustee for bondholders under a mortgage, and paid for the service, and whose business is also that of insuring titles to real estate for a consideration, may bind itself by a representation in regard to the title of the mortgaged property.

The president and the trust officer of a title insurance and trust company, who have sole charge and management under the authority of the directors of the business relating to its acting as the trustee for bondholders under a mortgage, for which service the company is paid, may bind it by a representation in regard to the title of the mortgaged property.

In an action for deceit founded on alleged false representations of a title insurance and trust company contained in a letter to A., which began, "We have in our possession the original documents printed in the advertisement of your bonds secured by mortgage to this company as trustee upon the B. tract in this city," the only representations declared on were contained in the letter and referred only to specific matters, and not to the advertisement generally. And the letter contained no representation in any way applicable to page 3 of the advertisement. *Held*, that that page was rightly excluded. *Held, also*, that a question of the defendant's counsel to the witness A., after the exclusion of that page, which question referred only to a certain writing on the cover of the advertisement, and had no relation to anything contained on page 3, did not make that page competent.

An action for deceit was brought on alleged false representations of a title insurance and trust company contained in a letter written by its president. A letter of the company written by the same officer five months afterwards did not necessarily relate to knowledge or opinions which the writer had when the first letter was signed, and had no reference to the matter of fact about which the actionable representation was made in the first letter, but only to the value of the security for the payment of bonds, which in that letter was referred to by way of estimate and opinion. *Held*, that the last letter was rightly excluded.

KNOWLTON, J.    This is an action for deceit which was one of thirteen cases tried together, founded on alleged false representations of the defendant contained in the following letter :

"Minneapolis, Minn., Feb. 6, 1890.    Mr. George W. Davis, Minneapolis, Minn.    Dear Sir, — We have in our possession the original documents printed in the advertisement of your bonds secured by mortgage to this company as trustee upon the Hedderly tract in this city.    We indorse the estimates of value contained therein, made by Messrs. Marsh and Bartlett, I. C. Seeley, Jones, McMullan, & Co., and E. A. Harmon, all of whom are known as men of integrity and of sound judgment touching local real estate value.    That we consider the title good in you will appear from the fact that we have engaged to issue our policies of title insurance to the several holders of your mortgage bonds to the aggregate amount of $150,000, fully protecting such holders against loss or damage arising from any defect in said title or prior encumbrance thereon.    From our knowledge of the mortgaged property, and from its situation and prospects, we are of opinion that the mortgaged property is adequate security for the amount of your proposed loan.    Yours very truly, Minnesota Title Insurance & Trust Company.    J. U. Barnes, President."

George W. Davis, to whom the letter was addressed, made a mortgage to the defendant as trustee to secure the payment of two hundred bonds signed by himself, and amounting in the aggregate to $150,000.    These bonds were designed to be sold in the market for the benefit of one Hedderly, who had conveyed to Davis the land covered by the mortgage for an expressed consideration of $300,000, and the defendant was to hold the mortgage as security for the benefit of bondholders. The documents referred to in the first sentence in the letter were certificates giving estimates of the value of the mortgaged property, signed by Marsh and Bartlett, and the other persons mentioned.    These estimates gave the value of the land as about $250,000.    There were nearly ten acres of this land situated on the Mississippi River in the city of Minneapolis.    About one acre of it was on the grade of a street adjacent to it, and of the remainder about one half was the bed of a quarry which had been excavated fifty feet below the level of the street, and the other half was low land along the river, which was covered with

water in times of flood. On this low land were some very cheap houses occupied by tenants. There was evidence tending to show that the whole tract was not worth more than from $20,000 to $50,000, that Davis was a person of no pecuniary responsibility, and that the making of the bond and mortgage was part of a scheme of Hedderly and Davis to defraud such persons as might purchase the bonds. Each of the several plaintiffs bought some of these bonds, having first read the letter above quoted, and an advertisement printed by Davis recommending the property, and containing copies of the several certificates of value referred to in the letter. This letter was prepared by one Fish, who was counsel and trust officer of the defendant, and was signed by the defendant's president, who also had the general supervision of its business.

There was much evidence tending to show that these officers did not believe that Hedderly and Davis were acting otherwise than in good faith, or that the property was insufficient security for the bonds. On the other hand, there was evidence on which the plaintiffs relied as tending to show that the defendant's officers Fish and Barnes must have believed that the land was of much less value than the amount of the bonds, and that the most important statements of the letter were untrue.

In actions of this kind it is a familiar rule that there can be no recovery unless the representations were known by the defendant to be false, and were made with intent to deceive, or were made as of the defendant's own knowledge when he did not know them to be true. It is also a well established rule that statements which purport to be mere opinions, as distinguished from statements of facts, cannot be made the foundation of a recovery. *Belcher* v. *Costello*, 122 Mass. 189. *Carroll* v. *Hayward*, 124 Mass. 120, 122. *Chatham Furnace Co.* v. *Moffatt*, 147 Mass. 403. *Holst* v. *Stewart*, 154 Mass. 445. *Gordon* v. *Butler*, 105 U. S. 553. *Derry* v. *Peek*, 14 App. Cas. 337. *Le Lievre* v. *Gould*, [1893] 1 Q. B. 491. *Holbrook* v. *Connor*, 60 Maine, 578.

One of the false representations contained in this letter purports to be a statement of a fact, and it was known by the defendant's officers to be untrue. The statement in regard to the title, while it was not a direct affirmation that there was no encumbrance on the property, was intended to produce the belief among

purchasers of the bonds that the title was perfect, and it was rightly understood as a representation to that effect. *Powers* v. *Fowler*, 157 Mass. 318. The bonds secured by the mortgage on their face purport to be first mortgage bonds. The representation was false, for there was a prior mortgage of $30,000 on the property, as the defendant's officers well knew. It had been arranged that the defendant should reserve in its own hands bonds to the amount of $40,000 as a protection against this mortgage until it should be paid, and very likely the defendant's president and trust officer regarded the policies of title insurance which were to be issued as a perfect protection to the bondholders. But a bond secured by a second mortgage with a policy of title insurance is not the same as a bond secured by a first mortgage. Through the insolvency of the insurer, or for some other reason, the bond may prove to be of little or no value. This representation was evidently intended to mislead upon a material point, and it can be availed of by any one to whom it was made who was induced by it to make a purchase.

The other representations contained in the letter purport to be merely expressions of opinion. The defendant, by its president, concurred in the estimates of value contained in the certificates, and said that the makers of the certificates were "known as men of integrity and sound judgment touching local real estate value." There was no evidence at the trial that these persons were not known as men of integrity, and the weight of the evidence was that they were of good repute in regard to their judgment upon the value of ordinary real estate. But the plaintiffs must have known that an estimate of value of land, or a statement in regard to the reputation of a real estate expert, was a mere matter of opinion upon a subject about which absolute knowledge could not be expected. In most cases it would be impossible to prove that one was knowingly and wilfully false in giving such an opinion, and this is one of the reasons for refusing to enter upon inquiries of this kind in the trial of a case like the present. It would be unjust to convict one of fraud on a mere expression of opinion, upon any evidence which can ordinarily be introduced, and for that reason, as well as because common prudence forbids implicit reliance on such expressions, we have the general rule that false statements of opinion are not actionable. The doctrine stated in

*Medbury* v. *Watson*, 6 Met. 246, recognizing a distinction in some cases between a representation made by a vendor of property and one made by an apparently disinterested third person, should not be extended to a case like the present. We accordingly decide that the defendant is liable only for the false representation in the letter in regard to the title, and for that only to those of the plaintiffs to whom it was made, and who were induced by it to invest in the bonds.

The letter is addressed to George W. Davis, but the evidence shows that it was intended to be used by him in selling the bonds. He was expected to show it to those who might become purchasers, and to use it as an inducement to them to purchase. The representations were made to all such persons to whom it was shown by him, as much as if it had been addressed to them by name. *Windram* v. *French*, 151 Mass. 547. *Hunnewell* v. *Duxbury*, 154 Mass. 286. *Peek* v. *Gurney*, L. R. 6 H. L. 377. There can be no doubt, on the evidence, that the plaintiff James M. Keith is one to whom the representations were made, and who had a right to rely upon them, whether his purchase was of a large or a small number of the bonds. But we are of opinion that the letter was not intended to be used by purchasers of bonds to aid them in selling the bonds to others. A use of the letter for such a purpose would be unauthorized, for the letter was not written to go with the bonds, and to be passed from one to another as often as the bonds should be transferred.

The evidence given in the report on this branch of the case is not very satisfactory. It would seem as if the parties and the presiding justice were giving attention more particularly to other parts of the case. The ruling was that the defendant was not liable to any of the plaintiffs. The evidence seems to indicate that Davis sold to but one of the plaintiffs, James M. Keith, or perhaps only to him and J. D. Keith, L. J. Keith, and William B. Garritt; but upon the report, which is indefinite on this point, we fear we shall be doing injustice if, in granting a new trial, we should hold as to any of the plaintiffs that there was no evidence that their dealings were with Davis through James M. Keith as agent. It is said in the report " that the defendant issued its policy of title insurance to each purchaser of said bonds, upon being paid one dollar for each policy after the first."

There is nothing before us to show the form of these policies, but we infer that they were issued to purchasers of bonds by name. There is evidence that these plaintiffs received such policies, and in this perhaps there is something to indicate that the title to the bonds passed from Davis directly to them. James M. Keith testified that he submitted the letter of the defendant and the printed circulars to various of his customers, including all the plaintiffs; he also said: "It was suggested that if it could be arranged so as to make these bonds payable to order, so that they could indorse them to the defendant and transmit them by mail for collection, the same way they had been accustomed to transmit mortgage coupons they had taken from the company before, they would like some of these bonds. Davis subsequently reported to him that that could be done." It would appear, therefore, that the papers were shown to the other plaintiffs before any bonds were bought. He also testified that he paid for the bonds on delivery, and that his commission was taken out before payment. We think there was evidence for the jury in favor of all the plaintiffs on the question whether they bought their bonds of Davis through James M. Keith as an agent. If they did, the representations contained in the letter were made to them. If, on the other hand, Davis first sold the bonds to James M. Keith, and Keith sold them on his own account to the other plaintiffs, his use of the letter in dealing with them was unauthorized by the defendant, and they cannot maintain their actions.

We are also of opinion that there was evidence for the jury in favor of all the plaintiffs on the question whether the false representations of the defendant induced them to buy. In regard to some of the plaintiffs this evidence was clear and strong, while as to others it was largely inferential, but the testimony was that they all, or those acting for them, read the letter. The letter was of a kind which in all its parts would be likely to influence them towards a purchase, and the jury might have found, as to each of the plaintiffs, that it was an important inducement to an investment.

We are of opinion that the corporation might bind itself by a representation in regard to the title of the property. In the first place, it was legitimately acting as the trustee for the bondholders

under the mortgage, and was paid for that service. In that capacity it might properly do anything fairly incidental to the business in which it was acting in the interest of both the mortgagor and the holders of the mortgaged bonds. Secondly, it was in the business of insuring titles to real estate, and was paid for issuing policies of insurance on this title; making representations in regard to the title was so far incident to the principal undertaking for which it was paid, that it might properly make such representations to those who were about to take bonds. *Morville* v. *American Tract Society*, 123 Mass. 129. *King* v. *Sioux City Loan & Investment Co.* 76 Iowa, 11.

We are also of opinion that the president and trust officer who together issued the letter, and who had the sole charge and management of business of this kind under the authority of the directors, might bind the company by this representation in regard to the title. It certainly was within the apparent, and we think also within the real, scope of their authority. *Holmes* v. *Turner's Falls Co.* 150 Mass. 535. *McNeil* v. *Boston Chamber of Commerce*, 154 Mass. 277. *Fishkill Savings Institution* v. *National Bank of Fishkill*, 80 N. Y. 162.

Page 3 of the advertisement was rightly excluded. The only representations declared on by the plaintiffs were those contained in the letter, and these representations refer only to specific matters, and not to the advertisement generally. The letter contains no representation which is in any way applicable to page 3 of the advertisement. The questions of the defendant's counsel to the witness Davis, after the exclusion of page 3 of the advertisement, did not make that page competent. They referred only to a certain writing on the cover of the advertisement, and they had no relation to anything contained in page 3.*

---

* After giving an exaggerated statement of the location, availability, and value of the property, page three continued as follows: " The present owner bought the property for an investment, and is floating these bonds to help carry the property, having himself put in ($150,000) one hundred and fifty thousand dollars over the amount of these bonds, or a total of ($300,000) three hundred thousand dollars, and, to make the securities desirable and sure income producing, has assigned the rentals to the Trust Company to meet the semi-annual interest. An insurance policy of the Minnesota Title Insurance and

The later letter from Barnes was also rightly excluded. It was written on July 5, 1890, about five months after the letter given to Davis. It does not necessarily relate to knowledge or opinions which the writer had when the letter of February 6 was signed; moreover, it has no reference to the matter of fact about which the actionable representation was made in the letter of February 6, but only to the value of the security, which in the original letter was referred to by way of estimate and opinion.*

In the opinion of a majority of the court the entry should be,

*Verdicts set aside.*

*R. M. Morse & J. W. Keith,* for the plaintiffs.

*A. A. Strout & E. L. Rand,* for the defendant.

---

Trust Company accompanies each bond, guaranteeing the title to be perfect." Then came a statement that the following letters (the documents referred to in the letter of February 6, 1890) were in the possession of the company, " who will cheerfully answer inquiries touching this property."

In regard to the examination of the witness Davis, the report is as follows:

" On cross-examination, Mr. Davis was asked by the defendant's counsel to write the words '$125,000 mortgage due July, 1890, 13 acres in San Francisco, and in miscellaneous notes,' and did so.

" The defendant's counsel then showed the witness a copy of the Davis advertisement, and called his attention to some writing upon its cover, without calling his attention to any printed matter upon or contained in the book, and asked the following question:

"*Q.* Did not he (referring to a certain party) ask you what property you had outside the Hedderley tract, and did not you take up that advertisement and upon the cover of it write down (and he took it in his possession) the property that you owned outside the Hedderly tract as being $125,000, mortgage due in July, thirteen acres of land in San Francisco, $47,500 in miscellaneous notes? *A.* I do not remember that I did; no, sir."

* The letter of Barnes was as follows:

"Minneapolis, Minn., July 5, 1890.

" George W. Davis, Esq., City.

Dear Sir, — Your communication of the 3d inst. duly received. I long ere this considered the matter of handling your bonds, but decided at the start that this company has no clients who would be likely to favorably consider them. The property securing them is of peculiar character, and, although it may be ample in value, there is such difference in opinion as to its real worth that we should find the same difficulty in disposing of them which you have met. We do not care to undertake the task. Yours truly,

"J. U. Barnes, Prest."