The BARRETT ROOFING & SUPPLY CO.
v.
Patrick ROSS, d/b/a Ross Flashing Co.
Civ. A. No. 53–1050.

United States District Court
D. Massachusetts.

May 3, 1955.

**350**

Herbert L. Cohen, Bridgeport, Conn., Lawrence A. Sullivan, Foley, Hoag & Eliot, Boston, Mass., for plaintiff.

Viola & Singer, W. Langdon Powers, Boston, Mass., for defendant.

ALDRICH, District Judge.

This is an action, sounding in tort and contract, arising out of the manufacture and sale by the defendant, hereinafter called Ross, of a quantity of copper fabric spandrel flashing. Ross is a citizen of Massachusetts, and the plaintiff, hereinafter called Barrett, is a corporation of the State of Connecticut. In 1952 Barrett was employed as a subcontractor to do the roofing and flashing on a series of medium-cost brick buildings in Bridgeport, Connecticut being erected by a public housing project, hereinafter called the Authority. The general contractor was the E. & F. Construction Co. On April 18, 1952 Barrett, following preliminary negotiations in which Ross indicated a willingness to perform, ordered by letter "approximately 160,000 square feet" of 3 oz. copper fabric spandrel flashing. This meant a flashing with a 3 oz. copper center (sheet copper which weighs 3 oz. to the square foot) coated on both sides with an asphalt mastic and entirely covered with a fabric material. Spandrel flashing means, in the trade, that it is to be used at each floor level, as distinguished from a roofing flashing. Ross knew that this flashing would be installed by Barrett and that the specifications given him by Barrett were those prescribed by the Authority, which had to be followed by Barrett to comply with its contract.

After Barrett had placed the order and Ross had acknowledged it, Ross furnished Barrett, in response to a previous request, with samples of the flashing for submission to, and approval by, the Authority. The copper in the samples exceeded 3 oz. Ross knew that Barrett's order on him was subject to cancellation if the Authority did not approve the samples. They were approved in May, and the agreement became firm.

In 1952 copper was restricted. Barrett obtained a priority order for Ross large enough for him to purchase enough 3 oz. copper for the job. However, it was the practice for buyers not always to order copper for a specific job against a specific priority, due to delays, supplies on hand, etc. A buyer's only problem was to have his total orders and his total priorities add up. The evidence satisfies me that Ross did not purchase 3 oz. copper for this job, and never intended to. He had some copper on hand, of various weights. Before accepting the order he formed the intention to start off with 3 oz. copper, and shortly to change to one oz. or less. This would not only reduce his costs, but would leave him a surplus of copper priorities for non-priority uses. This intention he put into effect. All of the flashing furnished, except that for the very first building, contained copper weighing less than one oz.

Barrett had done business with Ross before. It had no reason to suspect his dishonesty, and neither Barrett nor E. & F., nor the Authority discovered his failure to live up to the specifications until most of the buildings were largely finished. (The reasons for this failure are discussed *infra*). Since the flashing had been built into the brick, to remove it and replace with conforming material would have required removing substantial portions of the outside walls and a prohibitive expense. Barrett immediately notified Ross. Ross, after a visit to the spot, took the position that it was Barrett's problem, and washed his hands of the affair, leaving it to Barrett to work out his own terms with E. & F. and the Authority. I find that he had ample opportunity given him to join in, or take over, if he preferred, the subsequent settlement negotiations, but that he rejected it. Barrett thereafter settled with E. & F. on terms hereafter described.

Before coming to the question of damages the bases of liability must be considered. I find this was a substantial

failure of performance. One oz. copper not only does not sound as good as 3 oz. copper, but in fact it is not as good, either from the standpoint of waterproofing, or longevity. I do not believe the testimony that the mastic is the only important part of the flashing. The copper is important, and one oz. copper is so thin that no one ever uses it for this purpose.

■■ The plaintiff's first count is for fraud. I find that Ross made misrepresentations of several types. In the first place, before Barrett placed its order Ross represented that it would fill it with material complying with the specifications. This was a misrepresentation of his intentions, and was nonetheless a statement of fact even though it referred to a state of mind. Feldman v. Witmark, 254 Mass. 480, 150 N.E. 329; Sallies v. Johnson, 85 Conn. 77, Restatement, Contracts, § 473. I find that Barrett relied on this misrepresentation and would not have entered into contractual relations with Ross had he been aware of the truth. The fact that it also involved a breach of warranty does not prevent an action for deceit. Spillane v. Corey, 323 Mass. 673, 84 N.E.2d 5, 13 A.L.R.2d 1368.

Secondly, when Ross delivered each shipment he described it, both on the container and on the invoice, as 3 oz. copper. These were misrepresentations as to all shipments except the earliest ones. I have a certain amount of difficulty, however, in finding that Barrett relied on them. While obviously Barrett would not have accepted the goods, or paid for them, had it known the truth, I recall no affirmative evidence that it relied on the misstatements on the containers. Barrett did testify, however, that it "was billed," and "was not suspicious at all." If the evidence warrants my drawing the inference that Barrett did rely upon the invoices (bills), I do draw such an inference. Cf. Nash v. Minnesota Title, etc., Co., 159 Mass. 437, 443, 34 N.E. 625.

■ The evidence further indicated, and I find, that Ross inserted more than the customary amount of mastic to conceal the loss of stiffness caused by the lack of copper. He did this not to make the material better, but to lessen the likelihood of the discovery of the copper deficiency. In light of the evidence that Barrett did make some occasional inspection of the material, which was, in addition, handled on installation by Barrett's employees, and the further fact that frequent inspection of some sort was made by representatives of either E. & F. or the Authority, if it is permissible for me to do so I find that the additional mastic was itself an actionable misrepresentation relied on by Barrett.

■■ With regard to reliance in general, I find that Barrett's inspection was cursory. It could not tell from feeling the material, and knew that it could not tell, the copper content. Even 3 oz. copper is very thin. Both parties agree that because of the relative thickness and stiffness of the asphalt and the fabric, which completely covered the copper, it is not possible to tell by feeling or surface examination of the completed product if a substitution has been made. (This was particularly so in this case because of the extra amount of mastic.) On the other hand there was nothing about the flashing which put Barrett on notice that it was substandard. I rule that under the circumstances it had no duty to examine for other than obvious defects, and I find that there was no such defect. I also find that additional inspection sufficient to discover the deception would have been comparatively easy, but I find and rule under the circumstances that this was not required. Forman v. Hamilburg, 300 Mass. 138, 14 N.E.2d 137. The tort rule is based on public policy and requires "inexcusable negligence". Holst v. Stewart, 161 Mass. 516, 522, 37 N.E. 755. I find there was no such negligence. Lewis v. Jewell, 151 Mass. 345, 24 N.E. 52. Yorke v. Taylor, Mass., 124 N.E.2d 912.

■ There being fraud, the question becomes, what were its proximate foreseeable consequences? Just as "loss of profits which follow as a natural con-

sequence of a breach of contract, and which may reasonably be supposed to have been within the contemplation of the parties at the time they made the contract as a probable result of a breach," may be recovered, Eastern Paper, etc., Co. v. Herz Mfg. Co., 323 Mass. 138, 145, 80 N.E.2d 484, 489, so may proximate damages that are similarly foreseeable. Royal Paper Box Co. v. Munro & Church Co., 284 Mass. 446, 188 N.E. 223. Ross knew what use was to be made of the flashing by Barrett. He could reasonably expect a substantial claim to be made, and successfully made, against Barrett for breach of contract. Indeed, a purposeful substantial departure from specifications might have put the entire recovery in jeopardy. Cf. Russo v. Charles I. Hosmer, Inc., 312 Mass. 231, 44 N.E.2d 641. Although the matter did not reach suit, Ross was called upon to come in, and he is liable for the settlement which Barrett made with E. & F., which I find was reasonable and advantageous. Gray v. Boston Gaslight Co., 114 Mass. 149; Royal Paper Box Co. v. Munro & Church Co., 284 Mass. 446, 188 N.E. 223; Boyce v. Fowler, D.C.D. Mass., 87 F.Supp. 796; Williston, Contracts, § 1355. He is also liable for Barrett's reasonable counsel fees in defending itself against the claim and effecting its disposition. Spillane v. Corey, 323 Mass. 673, 84 N.E.2d 5, 13 A. L.R.2d 1368.

■ I accordingly find as damages the sum of $18,000 [1] which Barrett paid E. & F. in settlement, plus its counsel fee of $1206. I do not go along with the defendant that "difference in value" is limited to comparative sales prices. Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N.E. 682, 15 L.R.A.,N.S., 855.

■ I turn now to the counts for breach of warranty. There was a warranty that the material would contain 3 oz. copper. It seems to me that this was an express warranty. Denenberg v. Jurad, 300 Mass. 488, 15 N.E.2d 660. There was also a warranty that the goods would conform with the sample, an implied warranty. M. & M. Co., Inc. v. Hood Rubber Co., 226 Mass. 181, 115 N.E. 234. Both were soon broken. I find no other warranties that were broken.

■ The damages for breach of warranty are the same in this case as for fraud. There is, however, another problem. The burden was on Barrett to give notice reasonably soon after it knew "or ought to have known" of the breach. Mass.G.L.Ch. 106, § 38. I find that it gave prompt and adequate notice as soon as it actually knew, but there is more difficulty with respect to ought-to-have-known. There is no Massachusetts case defining this standard. I do not know whether there is a duty to make a reasonable inspection for easily discoverable defects, or whether merely to apply the tort rule of "inexcusable negligence," or failure to discover obvious defects. Cf. Gascoigne v. Cary Brick Co., 217 Mass. 302, 104 N.E. 734; Day v. Mapes-Reeve Construction Co., 174 Mass. 412, 54 N.E. 878. If the higher standard is to be applied, I find that Barrett did not meet it. It could have peeled off small pieces of fabric with very little trouble. The difference in the copper, had it been so exposed, would have been apparent.

■ The purpose of requiring notice is said to be so that the vendor will not be misled or taken advantage of. Idzykowski v. Jordan Marsh Co., 279

---

1. This figure was made up of, (1) $13,800 which was the difference in value of the copper content between the 3 oz. sheet copper content which was supposed to be in the flashing and ¾ oz. Based on the spot tests I find that ¾ oz. was reasonable as an average. I also find this was a fair and reasonable thing to do, and if anything. too small a figure, having in mind that no one ever uses copper of that weight for this type of flashing in spite of the saving in cost. (2) the cost to E. & F. of replacing what it was not too late to remedy; obviously proper. (3) an estimate for future repairs. This last was an appropriate element. Gascoigne v. Cary Brick Co., 217 Mass. 302, 104 N.E. 734.

Mass. 163, 181 N.E. 172. It is to be noted that § 38 apparently requires prompt notice for the purpose of rebutting the inference which might otherwise arise from the acceptance of the goods. Where Ross knew that his goods were defective and would never be acceptable were the true facts known, he did not draw that inference, and I will hold that he is in no position to insist on the stricter standard, and that the notice that was given him was timely. It follows that recovery may be had for breach of warranty.

This brings me to the counterclaim. At the time of the discovery of Ross's non-performance, Barrett had installed approximately 144,000 square feet of flashing. It had recently received additional flashing of the now-discovered one oz. material. While it gave adequate notice, on any standard, as to this shipment and made it clear to Ross that it did not conform, by oversight or otherwise, it neglected to tender it back. It made the tender in court, but, over defendant's objections this was manifestly too late. It has now no defence to Ross's counterclaim for the contract price of $4,495.85, except to offset provable damages for breach of warranty. Mass.G.L. Ch. 106, § 58. I compute these as follows.

The difference in cost of the copper content alone for the amount of flashing Barrett had installed in the buildings and the 3 oz. copper it should have had was $13,800. This divided by 144,000 feet comes to 9.5¢ a foot, reducing the cost to 14.3¢ a foot. In view of the fact that no one ever uses such copper fabric flashing, I conclude that it must have even less value than this difference in cost. On the other hand I will not find that it has no value at all. For certain work, fabric flashing (although not in this form), having no copper content is used. I think it would be fair to split the contract price of 23.8¢ in two, and I so find.

In conclusion, I make certain subsidiary comments on the facts. Even though not all specifically mentioned herein I find to be true all of the facts contained in the written stipulation filed by the parties. I find Ross to be an unconvincing witness, and note particularly his exceptional lack of knowledge and memory during his pretrial deposition whenever prompted by comments or suggestions by his counsel (who was not trial counsel), which occurred quite frequently. Furthermore, I draw inferences from his failure to produce his second foreman, or any other witness who could testify as to what went on at his plant.

I find plaintiff's damages as follows: (1) For the loss attributable to the material installed, $18,000 (2) For counsel fees and expenses of the settlement, $1,206 (3) For difference in value of material received and not installed $2,248. I find defendant's damages on the counterclaim, $4,496. Interest will be computed from the date of the commencement of the action.