Richard Phillip ROSENBERG, Appellant,

v.

**UNITED STATES, Appellee.**

Jerry ROSENBERG, Appellant,

v.

**UNITED STATES, Appellee.**

Nos. 6141, 6142.

District of Columbia Court of Appeals.

Argued April 19, 1972.

Decided Dec. 7, 1972.

Harvey B. Bolton, Jr., Washington, D. C., with whom Richard M. Millman, Washington, D. C. was on the brief, for appellants.

Thomas H. Queen, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. John A. Terry and Guy H. Cunningham, III, Asst. U. S. Attys., were on the brief, for appellee.

Before REILLY, Chief Judge, and KERN and NEBEKER, Associate Judges.

REILLY, Chief Judge:

The principal issue presented by these appeals is one of statutory construction, *viz.*, whether the unexplained possession of large quantities of capsules, quinine hydrochloride, dextrose, and lactose—materials used by illicit dealers in heroin to adulterate and package their products for individual users of narcotics—is a violation of D. C.Code 1967, § 22–3601, which makes it illegal to possess the implements of a crime. Both appellants were found guilty of violating this section of the Code after a jury-waived trial. A fine of $1,000 was

imposed on each, together with a suspended sentence of one year's imprisonment.

The evidence at the trial may be summarized briefly as follows:

The appellants are proprietors of a retail drugstore that over a period of some four months ordered from a local pharmaceutical wholesaler a total of approximately 36,500 gelatin (No. 5) capsules, 384 ounces of quinine hydrochloride, 36 pounds of dextrose, and 125 pounds of lactose. It is conceded that these items may be sold to the public without medical prescription. None is defined as a narcotic drug.

Two pharmacists employed at the drugstore (neither appellant is a pharmacist) testified that while these items have some legitimate uses, they had sold very few such items to customers in the previous six months, nor had they requested appellants to order any for stock replenishment. A representative of a large retail drug chain in this area testified that there was virtually no demand by regular drugstore patrons for any of the enumerated items. It was his "expert" opinion that no retail pharmacy could have a normal business use for such quantities in the ordinary course of trade during the period in question. An employee of the Bureau of Narcotics and Dangerous Drugs testified that heroin users in the District generally obtain the drug from illicit dealers in capsules. Prior to sale, dealers insert the heroin in No. 5 gelatin capsules which also contain lactose and quinine. An undercover agent of the Bureau, also called as a witness, said that he had visited the pharmacy on five occasions and had spoken to appellants about purchasing "cutting stuff" (street jargon for adulterating materials for heroin) and had been told by them that a shipment was expected.

Appellants did not take the stand but called as a witness the owner of a small drugstore chain, who testified that the individual items ordered by appellants may be purchased without any legal restrictions whatsoever and that he would sell them to any customer without question. He admitted, however, that the demand was slight and that an inventory of these items in such quantities by a single pharmacy was "very unusual."

In this court, appellants argue that the statute is unconstitutionally vague on its face or at least as applied here. They also contend that the Government failed to prove they possessed the items charged in the informations, or that they intended to use them in the commission of a crime. Because of our disposition of these appeals, we deem it unnecessary to pass upon these issues.

In our view, the threshold question to be determined—assuming without deciding that the invoices received in evidence justify an inference of possession of the items described therein—is whether the possession of such materials is encompassed by the section of the Code to which reference has been made, *viz.*, § 22–3601, which reads:

> No person shall have in his possession in the District any instrument, tool, or other implement for picking locks or pockets, or that is usually employed, or reasonably may be employed in the commission of any crime, if he is unable satisfactorily to account for the possession of the implement . . . .

Despite the breadth of the residual phrase ". . . or reasonably may be employed in the commission of any crime," it will be noted that the key words in this section are "instrument, tool, or other implement . . . ." We have recognized that notwithstanding the words of limitation following immediately thereafter, the statute is not confined to instruments, tools and implements employed in housebreaking or pickpocketing, but encompasses such a combination as a syringe, needle, cooker, and tourniquet, in circumstances strongly suggesting that the possession of such a kit is intended for use in injecting heroin into a human body. Tompkins v. United States, D.C.App., 272 A.2d 100 (1970);

McKoy v. United States, D.C.App., 263 A. 2d 645 (1970). Here it is argued that the possession of capsules, lactose, dextrose, and quinine, in the quantities ordered by appellants, amounts to the possession of items which are usually employed in the commission of such crimes as the prohibited manufacture, sale, or possession of narcotic drugs. Accepting this premise, however, the question remains as to whether the terms "instrument, tool, or other implement"—or any of them—encompass the materials and articles that appellants were convicted of possessing. Unless this question can be answered in the affirmative, the convictions must be set aside.

■ It is fundamental that "[i]n construing a statute the primary rule is to ascertain and give effect to legislative intent and to give legislative words their natural meaning." General Motors Acceptance Corporation v. One 1962 Chevrolet Sedan, D.C.App., 191 A.2d 140, 142 (1963). We turn then to the dictionary to ascertain the meanings of the words "instrument," "tool" and "implement." An "instrument" is defined in a general sense as "a means whereby something is achieved, performed, or furthered" and, more specifically, as a "utensil" or "implement." Webster's New International Dictionary (3d ed.). A "tool" is defined as "an instrument (as a hammer or saw) used or worked by hand: an instrument used by a handicraftsman or laborer in his work: implement" and also as "an implement or object used in performing an operation or carrying on work of any kind: an instrument or apparatus necessary to a person in the practice of his vocation or profession." Webster's, supra. Finally, an "implement" is defined as "a tool or utensil forming part of equipment for work." Webster's, supra. Significantly, this dictionary lists all three words as synonymous under the "implement" entry, observing that these terms "apply in common to any device usu[ally] relatively simple for performing a mechanical or manual operation." Webster's, supra.

■ It is apparent that each of these words in its commonly accepted meaning refers to an object with some sort of operative function, and the legislative history of the statute provides no indication that Congress intended these critical words to have any different meaning. It is true that the scope of the section has been expanded since its original enactment as part of the vagrancy laws (now ch. 33, tit. 22 of D.C.Code, 1967), when the instruments, tools and implements, possession of which was proscribed, were those "used for the commission of burglary, or the commission of any other crime against property, or for picking locks or pockets . . . ." (D. C.Code 1940, § 22–3301). In that form it was clearly intended as a "burglar tool" statute, the wording of which was typical of similar misdemeanor enactments in many states. See generally, cases collected at Annot. 33 ALR3d 798 (1970). In 1941, the specific references to "burglary" and "crime against property" were deleted by Congress, however, and the section took on a form much like its current wording, although it remained part of the vagrancy chapter of the Code until a 1953 amendment.[1] It is obvious that by this amendment Congress intended the statute to have broader applicability, thus justifying its application to narcotics paraphernalia, explosive mechanisms and other devices, the mere possession of which clearly implies criminal intent. Benton v. United States, 98 U.S.App.D.C. 84, 232 F.2d 341 (1956).

■ It is well settled that "[t]he object of a statute may be so general and its language so broad as to reach conditions fairly coming within its intent and sweep although such conditions did not come into existence until years after its enactment." Commonwealth v. Tilley, 134 Mass. 277, 280, 28 N.E.2d 245, 247 (1940). But while

1. Act of December 17, 1941, ch. 589, § 1, 55 Stat. 808; Act of June 29, 1953, ch. 159, § 209 (a), 67 Stat. 97.

it is one thing to hold that the statute encompasses a broader range of instruments, tools, and implements, than was originally contemplated, to broaden by judicial construction the very meanings of the words "instrument", "tool" and "implement" so as to include things not normally covered by those generic terms, is quite another. Such a construction is not only inconsistent with the established canon of strict construction of penal statutes, but might well open the statute to constitutional attack on grounds of vagueness. *Cf.* Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S. Ct. 839, 31 L.Ed.2d 110 (1972).[2]

 It is plain that lactose, dextrose, and quinine are inert chemical substances, even though possessing special properties for providing bulk to heroin. The capsules obviously are merely containers.[3] To call such items "instruments", "tools" or "implements" requires a Procrustean stretching of these words in derogation of the principles of statutory interpretation to which we have adverted.

In sum, our holding is that lactose, dextrose, quinine, and gelatin capsules are not "instruments", "tools" or "implements", and hence possession of such materials is not a criminal act under § 22–3601. In so holding, however, we are not suggesting that knowingly selling such materials to persons who use them in the illegal distribution of heroin might not constitute the crime of aiding and abetting the illict sale of narcotics. *Cf.* Mason v. United States, D.C.App., 256 A.2d 565 (1969).

The thoughtful opinion of the trial judge also reflects serious misgivings about the applicability of § 22–3601 to these cases. In his view that section of the Code cannot be "used to deal effectively with possession

of these items" and is a "clumsy and poorly designed statute" for this purpose. While we have gone further, and said that the statute cannot be used for this purpose at all, we recognize that the conclusion of the trial judge was unaided by previous authoritative construction, and concur in his observation that "a comprehensive and up-to-date narcotic paraphernalia statute" is needed to check the cancerous growth of heroin traffic with which this jurisdiction has been afflicted. *See* Wheeler v. United States, D.C.App., 276 A.2d 722 (1971).

Reversed.

---

2.  We note that the sentences in these cases were imposed prior to the Supreme Court's decision in *Papachristou.*

3.  We are aware that in several of the decisions of this court dealing with prosecutions under this statute, capsules have been listed in the inventory of narcotics paraphernalia found. While not explicitly stated, we feel sure that this inclusion was simply to make more clear the sinister implications of the paraphernalia as required by *Benton* and *McKoy. Cf.* Crawford v. United States, D.C.App., 278 A.2d 125 (1971).