**CITIZENS ASSOCIATION OF GEORGE-TOWN et al., Appellants,**

**v.**

**ZONING COMMISSION OF the DISTRICT OF COLUMBIA et al., Appellees.**

**No. 12926.**

District of Columbia Court of Appeals.

Argued En Banc June 5, 1978.

Decided Oct. 17, 1978.

Bruce J. Terris, Washington, D. C., with whom Suellen T. Keiner, Peter S. Craig, and Franz M. Oppenheimer, Washington, D. C., were on the briefs, for appellants Citi-

zens Ass'n of Georgetown, Committee of 100 on the Federal City, and Wisconsin Ave. Corridor Committee.

Louis P. Robbins, Principal Deputy Corp. Counsel, Washington, D. C., with whom Richard W. Barton, Deputy Corp. Counsel, John C. Salyer, III, and Leo N. Gorman, Asst. Corp. Counsels, Washington, D. C., were on the brief, for appellee Zoning Commission of the Dist. of Columbia.

Charles R. Donnenfeld, Washington, D. C., for appellee Georgetown Inland Corporations.

Whayne S. Quin, Washington, D. C., with whom Norman N. Glasgow, Washington, D. C., was on the brief, for appellees Corson & Gruman Co., Inc. and Wilkins-Rogers Milling Co., Inc.

A. Fred Freedman, Washington, D. C., with whom Deborah A. Glass, Washington, D. C., was on the brief, for appellee Papermill Associates.

Sarah C. Carey, Washington, D. C., for appellee Flour Mill Ltd. Partnership.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER,* NEBEKER, YEAGLEY, HARRIS, MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge:

This is an appeal from a decision of the Superior Court denying injunctive and de-claratory relief requested by appellants with regard to Zoning Commission (the Commission) Orders Nos. 103[1] and 104,[2] issued on November 20, 1974, as a result of rulemaking proceedings.[3] The trial court affirmed the action of the Commission, rejecting appellants' contentions that the orders were: (1) invalid because of inconsistency with the comprehensive plan for the National Capital; and (2) void because of *ex parte* communications between Commission staff and various representatives of appellees after the record was formally closed. On appeal, appellants alleged that the trial court's decision on both issues is erroneous.

In Section I of this opinion, we set forth briefly the judicial history of the Georgetown waterfront controversy. We focus on the issue of what constitutes "the comprehensive plan" within the meaning of the Home Rule Act[4] in Section II. In Section III, we discuss the issue of *ex parte* communications with the Commission staff during a Part III rulemaking proceeding. We affirm.[5]

I

*Procedural History*

The zoning of the Georgetown waterfront[6] has a long and somewhat complex

---

* Associate Judge Gallagher did not participate in the decision of this case.

1. Order No. 103 in Case No. 73–20 created regulations defining three new types of mixed use (*i. e.*, commercial/residential) waterfront districts.

2. Order No. 104 in Case No. 73–21 rezoned the Georgetown waterfront area into the new districts.

3. The rules of Practice and Procedure Before the Zoning Commission of the District of Columbia, 20 DCRR § 1.1 *et seq.*, provide for two types of proceedings: Part II, *id.* § 2.1 *et seq.*, "contested case" proceedings, and Part III, *id.* § 3.1 *et seq.*, "rulemaking" proceedings. Where proceedings are properly conducted as Part II proceedings, initial judicial review lies in this court pursuant to the District of Columbia Administrative Procedure Act (DCAPA), D.C. Code 1978 Supp., § 1–1501 *et seq.* Where the

proceedings are properly conducted as Part III proceedings, initial judicial review is in the Superior Court. *Dupont Circle Citizen's Ass'n v. District of Columbia Zoning Comm'n*, D.C. App., 343 A.2d 296, 308 (1975) (en banc) (Gallagher, J., concurring).

4. District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No. 93–198, 87 Stat. 774 (1973) (reprinted in D.C. Code 1978, Supp. at xi-xxxvii), is referred to throughout this opinion as the "Home Rule Act."

5. Because of our disposition of this case on these two issues, we need not reach such issues as estoppel raised by certain of the appellees.

6. The Georgetown waterfront refers to an area of approximately 42 privately-owned acres bounded by the Potomac River, M Street, Key Bridge and the Rock Creek Parkway.

history which, in more recent years, has engendered several legal actions. From 1920, when zoning began in the District of Columbia, to the time of the present rezoning, the Georgetown waterfront has been zoned for commercial and industrial uses. However, the National Capital Planning Commission (NCPC), formerly charged with preparing a comprehensive land use plan for the District of Columbia,[7] adopted a plan in 1968—the Comprehensive Plan for the National Capital, known as the "Red Book"—which in part called for the waterfront area to be devoted to low-density residential and parkland uses. In January 1972, the NCPC and the District of Columbia contracted with a group of private planners—the Georgetown Planning Group (GPG)—to do a study of the area and to prepare a development program for implementation of NCPC's recommendations.

In the interim between 1968 and 1972, certain private developers, including appellee Georgetown Inland Corporations (Inland), announced plans to build major new commercial centers in the waterfront which were permissible under the then-existing zoning. Seeking to prevent frustration of the NCPC "Red Book" plan, citizen groups, including appellants Citizens Association of Georgetown and Committee of 100, petitioned the Zoning Commission to adopt an interim amendment to the zoning regulations which would have prevented major construction not in conformance with the "Red Book" until completion of the GPG study.[8] On June 29, 1972, the Commission adopted an emergency amendment to the zoning regulations to preserve the status quo in the Georgetown waterfront area until hearings could be held on the proposed interim rezoning.

In August of 1972, hearings were held at which both supporters and opponents of the interim amendment testified. On October 4, 1972, the Commission revoked its emergency order and declined to adopt the proposed amendment. The citizen groups then filed suit in the United States District Court challenging the Commission's order. That court granted summary judgment to appellees on the ground that the NCPC comprehensive plan was advisory only and not binding on the Zoning Commission. The court further held that there was no showing that the Commission's action was arbitrary or otherwise unreasonable.

Affirming the District Court decision, the United States Court of Appeals for the District of Columbia Circuit refused to compel emergency rezoning of the Georgetown waterfront to prevent major construction not in conformance with the NCPC "Red Book" plan. *Citizens Association of Georgetown v. Zoning Commission*, 155 U.S. App.D.C. 233, 477 F.2d 402 (1973) (hereinafter *Georgetown II*). The Zoning Commission then engaged in a major effort to prepare new zoning proposals for the area. Upon completion of staff studies, the Commission held public hearings on August 6, 7, 8 and 9, 1973, on both the staff proposal to amend the zoning regulations to create a new mixed-use waterfront district with three levels of density (Case No. 73–20) and proposed amendments of the zoning maps to rezone the Georgetown waterfront area from existing M and C–M–2 zones (industrial and heavy commercial zones) to the proposed new zones (Case No. 73–21). These cases were conducted as rulemaking proceedings under Part III of the Commission's Rules of Practice and Procedure. 20 DCRR § 3.1 *et seq.* On November 20, 1974, the Zoning Commission issued Order No. 103 (Case No. 73–20) which amended the Zoning Regulations by adding three mixed-use waterfront zone districts (W–1, W–2, and W–3). On that date Zoning Commission Order No. 104 (Case No. 73–21) also was

---

7. D.C.Code 1973, §§ 1–1001 to –1013.

8. When the Commission failed to respond promptly, these organizations brought suit in this court for mandamus to compel action, which was dismissed for lack of jurisdiction. *Citizens Ass'n of Georgetown v. Washington*, D.C.App., 291 A.2d 699 (1972) (hereinafter *Georgetown I*) (Commission rulemaking action not reviewable as a "contested case" under DCAPA). Subsequently, a similar suit brought in federal district court was dismissed as moot when the Commission acted.

issued, rezoning the Georgetown waterfront area.

On January 2, 1975, plaintiff-appellants filed suit in the Superior Court against the Zoning Commission and other parties in interest. In that action, appellants requested declaratory judgment, mandamus, and injunctive relief declaring illegal and setting aside the two zoning orders. They contended that § 492(b)(1) of the Home Rule Act mandates that all zoning in the District of Columbia conform to the 1968 "Red Book" plan prepared by NCPC, at least until the NCPC and the Mayor act to publish a new comprehensive plan in accordance with the Home Rule Act.[9] They also argued that the zoning orders were illegal because of informal communications between Zoning Commission staff members and various interested parties. Defendants-appellees contended that the applicable comprehensive plan is not the "Red Book" and that the communications between Commission staff and developers were legitimate and proper in a rulemaking proceeding. Following extensive pretrial discovery, the parties presented cross-motions for summary judgment. The trial court determined that there were no genuine issues of fact to be tried and issued a Memorandum Decision on November 3, 1977. *Citizens Association of Georgetown v. Zoning Commission of the District of Columbia*, C.A.No. 11–75 (Super.Ct. Nov. 3, 1977).

As one of the grounds for its decision on the comprehensive plan issue, the trial court held that between the effective date of § 492(b)(1) and the adoption of a new "comprehensive plan" by the District of Columbia and NCPC pursuant to § 203(a) of the Home Rule Act, codified in D.C.Code 1978, Supp., § 1–1002(a)(4)(D), the comprehensive plan consisted of the existing zoning maps and regulations rather than the "Red Book." On the second issue, the trial court concluded that the communications between Commission staff and interested parties did not deprive the rulemaking proceeding of its essential fairness. The trial court denied appellants' motion for summary judgment and granted summary judgment to appellees.

Subsequent to the filing of this appeal, we issued our opinion in *Capitol Hill Restoration Society v. Zoning Commission*, D.C. App., 380 A.2d 174 (1977) (*Capitol Hill II*). Relying on that opinion, appellants sought to obtain from the trial court pending appeal, an order enjoining the issuance of further building permits and requiring cessation of any commercial construction then underway. After a hearing, the trial court denied the motion for an injunction pending appeal.

The trial court, in an oral opinion, rejected the reading of *Capitol Hill II* urged upon it by these appellants—*i. e.*, until a new plan is adopted by the District Government and NCPC pursuant to § 203(a) of the Home Rule Act, the "Red Book" is "the comprehensive plan" mandated by § 492(b)(1). The court found that such an interpretation would be inconsistent with the legislative history of the Home Rule Act and would be inconsistent with the careful division of planning authority made in other sections of that Act. According to the trial court, *Capitol Hill II* set forth as one criterion of District zoning that careful consideration be given to the views of the NCPC. After careful review of the zoning proceedings and the Commission's orders, the trial judge concluded that "on the whole it reflects consideration of the NCPC plan."

On December 27, 1977, appellants moved this court for an injunction pending appeal or summary reversal of the decision below. The relief requested was an injunction that would prohibit the issuance of building permits and stop developer-appellees from proceeding with construction. All appellees opposed both issuance of an injunction pending appeal and summary reversal. On January 27, 1978, a division of this court

---

**9.** Section 492(b)(1) amended the section of the D.C. Zoning Enabling Act, Act of June 20, 1938, *as amended*, D.C.Code 1973 & D.C.Code 1978 Supp., § 5–413 *et seq.*, dealing with the relationship between zoning regulations and the comprehensive plan and is codified at D.C.Code 1978 Supp., § 5–414.

heard oral argument on these motions. Thereafter, because of the importance of the question presented with respect to "the comprehensive plan" requirement and the desire of the court to reconsider portions of *Capitol Hill II*, the court *sua sponte* set the matter for oral argument on the merits before the en banc court. *See M.A.P. v. Ryan*, D.C.App., 285 A.2d 310 (1971).[10]

## II

### *The Comprehensive Plan*

Appellants' first issue on appeal—that the rezoning violates "the comprehensive plan" provisions of § 492(b)(1), and consequently that the trial court erred in finding to the contrary—requires us to determine what constitutes "the comprehensive plan" referred to by that section. All parties concede two things. First, pursuant to the holding of *Georgetown II* (and that of such cases as *Diedrich v. Zoning Commission*, 129 U.S.App.D.C. 265, 393 F.2d 666 (1968), and *Lewis v. District of Columbia*, 89 U.S.App. D.C. 72, 74, 190 F.2d 25, 27 (1951) cited therein, 155 U.S.App.D.C. at 237–38 n.14, 477 F.2d at 406–07 n.14), the statutory provision prior to the Home Rule Act referring to "a comprehensive plan" did not require compliance with the "Red Book" plan. Rather, the legislative mandate then applicable required only that the Commission zone on a uniform and comprehensive basis. Second, pursuant to § 203(a) of the Home Rule Act, the authority to adopt a new comprehensive plan is vested jointly in the District of Columbia (as to local elements of the plan) and the NCPC (as to federal elements of the plan). The issue dividing the parties is simply stated: from the effective date of the Home Rule Act (for these purposes, January 2, 1975) until a comprehensive plan is adopted in accordance with the procedures of § 203(a), what is "the comprehensive plan" with which zoning must be consistent as mandated by § 492(b)(1) of the Act. It is to the determination of what constitutes this "interim" plan that we now turn our attention.

"It is fundamental that '[i]n construing a statute the primary rule is to ascertain and give effect to legislative intent and to give legislative words their natural meaning.' " *Rosenberg v. United States*, D.C.App., 297 A.2d 763, 765 (1972) (citation omitted). Thus, "[w]hen a court construes a statute, the starting point must be the language of the statute." *March v. United States*, 165 U.S.App.D.C. 267, 274, 506 F.2d 1306, 1313 (1974) (footnote omitted).

The requirement that zoning actions shall not be inconsistent with the comprehensive plan for the National Capital appears in § 492(b)(1) of the Home Rule Act. This section amended the Zoning Enabling Act[11] to provide in pertinent part:

> Zoning maps and regulations, and amendments thereto, shall not be inconsistent with *the comprehensive plan for the National Capital* . . . . [D.C.Code 1978 Supp., § 5–414 (emphasis added).]

The section formerly read in pertinent part:

> Such regulations shall be made in accordance with *a comprehensive plan* . . . [D.C.Code 1973, § 5–414 (emphasis added).]

The original language "a comprehensive plan" had been interpreted, by the District of Columbia Circuit in prior litigation (also involving the Georgetown waterfront) to mean that zoning was not required to conform to the NCPC "Red Book" or any other formalized plan but rather to demonstrate internal consistency within the existing set of comprehensive zoning maps and regulations. *Georgetown II, supra* 155 U.S.App. D.C. at 237–38, 477 F.2d at 406–07, and cases cited therein at n.14. Appellants contend that the Home Rule Act amendment to this language clearly evinces a congressional intent to overrule legislatively the decision in *Georgetown II*. They assert that we correctly so decided in *Capitol Hill II, supra*. According to this view, by adopting the language "the comprehensive plan for the National Capital" in place of the

---

**10.** Our decision of the case this date renders these motions moot.

**11.** Act of June 20, 1938, *as amended*, D.C.Code 1973 & D.C.Code 1978 Supp., § 5–413 *et seq.*

prior language "a comprehensive plan" (language which appellants had contended in congressional testimony would have the effect of overruling *Georgetown II*), Congress mandated compliance with the "Red Book." [12]

■ "The literal wording of the statute is a primary index but not the sole index to legislative intent. It cannot prevail over strong contrary indications in the legislative history or so as to command an absurd result." *Lange v. United States*, 143 U.S. App.D.C. 305, 307–08, 443 F.2d 720, 722–23 (1971) (footnotes omitted). As the Supreme Court has pointed out, "[W]ords are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination."'" *Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943) (citations omitted).

■ It is a canon of statutory interpretation that one looks at the particular statutory language within the context of the whole legislative scheme when legislative intent is to be determined. 2A C. Sands, Statutes and Statutory Construction § 46.05 (4th ed. 1973). The Home Rule Act's purpose was to reorganize the governmental structure of the District of Columbia, to provide a charter for local government in the District of Columbia, and to delegate certain governmental powers to the local government. Pub.L.No.93–198, § 102(a), 87 Stat. 774 (1973). This stated purpose appears inconsistent with any intent to provide a federal agency (NCPC) with control over local zoning by requiring zoning to be consistent with a "comprehensive plan" prepared by the NCPC at a time when it still retained total authority for land use planning in the District. Moreover, a review of the relevant planning and zoning sections of the Home Rule Act dispels the suggestion of such an intention on the part of Congress.

■ Before enactment of the Home Rule Act, NCPC had served as the central planning agency for both the federal and District governments in the National Capital Area. The Home Rule Act made important revisions with respect to that authority. As amended by § 203(a)(1) of the Act, D.C. Code 1978 Supp., § 1–1002(a)(1) now provides:

> The National Capital Planning Commission . . . is created as the central Federal planning agency for the Federal Government in the National Capital
> · · · ·

Section 203(a)(2) of the Act made the Commissioner of the District of Columbia (now the Mayor) responsible for central planning for the District of Columbia government. It provides:

> The Mayor shall be responsible for coordinating the planning activities of the District government *and for preparing and implementing the District elements of the comprehensive plan for the National Capital*, which may include land use elements, urban renewal and redevelopment elements . . . . [D.C.Code 1978 Supp., § 1–1002(a)(2) (emphasis added).]

The Mayor's responsibility in the planning area does not, however, extend to federal or international projects and developments in the District. *Id.*

The Home Rule Act further provides for public participation in formulation of the District elements and for reconciliation of the District elements with the federal interest. Section 203(a)(3) amended D.C.Code 1973, § 1–1002(a) to read:

> The Mayor shall submit each District element of the comprehensive plan and any amendment thereto, to the Council for revision or modification, and adoption, by act, following public hearings. Following adoption and prior to implementation, the Council shall submit each such element or amendment to the Commission for review and comment with regard to the impact of such element or amendment on the interests or functions of the Federal Establishment in the National Capital. [D.C.Code 1978 Supp., § 1–1002(a)(3).]

---

**12.** *See* note 15 *infra*.

The NCPC has 60 days under the Act to certify to the Council whether such District elements or amendments to the comprehensive plan have a "negative impact" on the Federal Establishment. If the NCPC has taken no action within the prescribed 60 days, "such element or amendment shall be incorporated into the comprehensive plan for the National Capital and shall be implemented." D.C.Code 1978 Supp., § 1–1002(a)(4)(A).

Moreover, the Home Rule Act provides that the Mayor and the NCPC "shall jointly publish, from time to time . . . a *comprehensive plan for the National Capital,* consisting of the elements of the comprehensive plan for the Federal activities in the National Capital developed by the Commission, and the District elements developed by the Mayor and the Council . . ." D.C.Code 1978 Supp., § 1–1002(a)(4)(D) (emphasis added). No time limit is set for preparation of this plan, nor is there to be a moratorium upon zoning activities until the plan is in effect.

■ Thus, after July 1, 1974,[13] the NCPC's planning role is limited to preparing the federal elements of the comprehensive plan for the National Capital and to exercising veto authority over those proposed District elements which it finds will have a negative impact on the interests of the Federal Establishment.

There is sparse legislative history on § 492, and, significantly, it is intertwined with the legislative history of the Act's planning sections. However, such legislative history as exists makes clear that the only comprehensive plan referred to in the Home Rule Act (§ 492 thereof) is the "Home Rule plan." As Subcommittee Chairman Brock Adams[14] explained when the Subcommittee's final draft was presented to the Full Committee: "We have provided in the Bill something which is necessary now which doesn't exist now . . . which is that zoning must conform to the

comprehensive plan." House Comm. on the District of Columbia, 93D. Cong., 2D. Sess., 2 Home Rule for the District of Columbia 1973–1974, at 1021 (Comm. Print 1974) (Full Committee Markup of H.R. 9056, Tues., July 17, 1973). The plan referred to is that authorized by § 203: "[T]here is just one plan in the District and the one plan is the comprehensive plan. . . . [T]he Commissioner [Mayor] . . . and the Commission [NCPC] shall jointly put out the plan so that both parties are involved in making this thing go . . . ." *Id.* at 1019. Furthermore, the Committee Report accompanying the final legislation, H.R. 9682, replied forthrightly to assertions that the language as to the comprehensive plan was unclear:

> The dissenting views imply that the legislation calls for the formulation of two mutually exclusive land use plans for the District of Columbia. *The intent of the legislation is to create one comprehensive plan for the National Capital region with two separate parts*—one dealing solely with elements related to the Federal interest and one related solely to local matters. *These two separate parts taken together shall constitute the comprehensive plan established by H.R. 9682.* [*Id.* at 1635 (Comments of the Full Committee staff on the Dissenting Views to the Committee Report on H.R. 9682) (emphasis added).]

The Report also indicates that the reason the Zoning Commission is required, in § 492, to conform amendments and regulations to this jointly prepared comprehensive plan is as "[a] safeguard to protect the Federal interest." *Id.* at 1641–42. This was done to alleviate the concerns expressed by appellants, among others, that planning and zoning by locally elected officials would not adequately protect the federal interest.

We believe it is clear, and indeed appellants concede, that "the comprehensive plan for the National Capital" referred to in

---

**13.** The effective date for § 203 of the Home Rule Act. Pub.L.No.93–198, § 771(b), 87 Stat. 774 (1973).

**14.** The Home Rule legislation was drafted by the Subcommittee on Government Operations of the House Committee on the District of Columbia.

§ 492(b)(1) of the Home Rule Act is the jointly prepared and published plan authorized therein. Nevertheless, they contend that the fact that the Committee preparing the Home Rule Act adopted the language of § 492(b)(1) from testimony and suggested legislation provided by appellants supports their interpretation of that section.[15] To wit, that since Congress clearly intended to "legislatively overrule" the *Georgetown II* decision, it cannot have meant to allow a period before preparation of the newly authorized comprehensive plan during which that decision would remain legally operative. Appellants argue that since the "Red Book" is the only currently existing comprehensive plan, it must govern until such time as it is replaced. Notwithstanding the Home Rule Act's undeniable purpose to allow the District to control its own local government functions, appellants would have this court rule that the NCPC has more influence and control over local planning and zoning after the Home Rule Act than it had before, at least until the District elements of the comprehensive plan are promulgated.

We find nothing to suggest that Congress through § 492(b)(1) intended that the dichotomy between the federal and District planning authority which it so carefully created would be inoperative and that the NCPC plan would control until such time as the Mayor and Council proposed and adopted District elements to the comprehensive plan. The fact that the District elements of the plan which the Act authorized have not yet been adopted does not alter our conclusion. There is no indication in the legislative history that Congress intended to require interim conformity with the NCPC "Red Book" until the joint plan took effect. In the absence of such an expressed intent, we will not construe § 492 to command a result so much at odds with the clearly expressed purposes of the Home Rule Act.

We find additional support for this conclusion in the language of the Home Rule Act's saving clause:

> No law or regulation which is in force on the effective date of Title IV of this Act shall be deemed amended or repealed by this Act except to the extent specifically provided herein . . . . [Pub.L.No. 93–198, § 717(b), 87 Stat. 774 (1973).]

As we have earlier indicated, the "Red Book" never enjoyed the force of law prior to enactment of the Home Rule legislation. Insofar as zoning actions were concerned, it was considered to be merely advisory. It would be incongruous for this court to elevate the NCPC and its plan to a status from which it would exercise control over District planning and zoning when that authority has been delegated to the local government and the NCPC jointly and when the NCPC's concerns have been delimited strictly to the Federal Establishment. It is far more likely, in our view, that the saving clause was intended to preserve the existing order until the authorized plan is prepared.

■ We therefore hold that the only comprehensive plan with which § 492(b)(1) requires that zoning must be consistent is the plan to be adopted pursuant to § 203(a) of the Home Rule Act. That plan has not yet been published by the District and the

---

**15.** At Subcommittee markup sessions on the Home Rule legislation, there was discussion of appellants' testimony at the hearings held simultaneously with the drafting of the bill. Appellants advocated an alternative approach to the transfer of certain NCPC functions to the local government. They sought to strengthen the existing NCPC and to give greater representation thereon to the District by restructuring the membership of the Board, but also to retain the comprehensive planning function as a responsibility of the NCPC. One of the organizations testifying in those hearings and making detailed proposals on zoning matters was the Committee of 100.

The effect of the Committee of 100 proposals, had they been accepted in their entirety, would have been to require that zoning be in conformity with the comprehensive plan enacted by the NCPC. *See* 1 *Id.* at 439–41 (Subcommittee Markup of Discussion Draft No. 2, Mon., June 11, 1973). These proposals, however, were not incorporated in their totality because of strong opposition from District government officials and others to the substitution of federal for local authority as the comprehensive planning agency for the District. *See* 1 *Id.* at 486–87, 490 (Subcommittee Markup of Discussion Draft No. 2, Wed., June 13, 1973).

NCPC. Thus, at present, compliance with the comprehensive plan provision of § 492(b)(1) of the Act requires solely that the Commission "zone on a uniform and comprehensive basis." *Georgetown II, supra* 155 U.S.App.D.C. at 237–38, 477 F.2d at 406–07. To the extent that anything in our opinion in *Capitol Hill II* may constitute a holding to the contrary, it is overruled.

### III

#### *Ex Parte Communications*

Appellants contend that a continuing pattern of improper *ex parte* communications between the Zoning Commission staff and developer-appellees, particularly appellee Inland, violated the requirements of the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code 1978 Supp., § 1–1501 *et seq.*, and of due process and denied them a fair hearing. Although appellants point to *ex parte* contacts which occurred at three stages of these proceedings,[16] we will address only the effect of those *ex parte* communications which took place between the closing of the record and issuance of the Commission's final orders.

Appellees counter that the proceeding was a rulemaking; not confined to the stricter procedures of a contested case; and was essentially fair. Furthermore, according to appellees, there was procedural fairness because: (1) the final action taken by the Commission was within the contours of the advertised proposals; (2) appellants were offered the opportunity to comment thereon; and (3) appellants had significant opportunity to contribute to the decision-making process. *Aquino v. Tobriner*, 112 U.S.App.D.C. 13, 298 F.2d 674 (1961). *See Castle v. McLaughlin*, 106 U.S.App.D.C. 145, 270 F.2d 448 (1959).

A recapitulation of the relevant facts is necessary at this point. The zoning dockets for Case Nos. 73–20 and 73–21 were opened in June 1973 as a rulemaking under the Commission's Part III Rules. *See* 20 DCRR § 3.1 *et seq.* At public hearings from August 6 through August 9, 1973, Commission members heard extensive testimony and received written statements in support of proposed new W-zones from Commission staff and property-owners as well as opposition from representatives of the NCPC, GPG, Fine Arts Commission, C&O Canal Commission, National Trust for Historic Preservation, American Institute of Architects, and appellants. Comments were also received from various departments of the District of Columbia government. The record was then held open for three weeks for further submissions and was officially closed on August 31, 1973. Final Orders No. 103 and No. 104 were signed by the Commission on November 20, 1974, more than one year later.

The facts, developed during lengthy pretrial discovery in this case, established that prior to issuance of the challenged orders, Commission staff, but not Commission members, had informal contacts with a variety of persons interested in the Georgetown waterfront zoning. The trial court found that "the details of the contacts are recorded in exhibits which are not controverted in their factual aspects." *Citizens Association of Georgetown v. Zoning Commission of the District of Columbia*, C.A.No. 11–75, slip op. at 6 (Super.Ct. Nov. 3, 1977) (mem.). The contacts included the following types of incidents. There were several breakfast or lunch meetings (usually paid for by appellees) with J. Kirkwood White (then Assistant Director of the Office of Planning and Management (OPM)) and Inland representatives.[17] Inland staff prepared and submitted complete drafts of W-zone regulations and map amendments for the waterfront which were not placed in the

---

16. Appellants describe *ex parte* communications occurring both before the announcement of a hearing on the proposed regulations and during the time the record was open, appellants' brief at 50–57, but they only claim that those contacts that occurred after the record was closed violated their rights.

17. During the relevant time period, OPM provided staff support for the Zoning Commission. Thus, contacts with OPM staff were equivalent to contacts with Commission staff.

public files nor distributed to other interested persons. Inland's attorneys also prepared several revised drafts of C–R (Commercial-Residential) districts, which were also being considered for the rezoning of the waterfront as well as for the West End at that time. In July 1974, Inland advised White of the possible abandonment of future phases of their Georgetown project because of alleged financial problems. In October 1974, White and staff met with Inland representatives who were there to urge opposition to the proposed 80 foot height limit. On November 19, 1974, Inland's attorney was allowed to review "for errors" the final version of the orders, which were to be signed by the Zoning Commission at their November 20, 1974 meeting. Other developers met with White and OPM staff to discuss the need for greater height and FAR (Floor Area Ratio) in order to develop specific waterfront sites. Appellants met once with Commission staff members to discuss the status of the proposed regulations and no mention was made of Inland's drafts or proposals. None of these *ex parte* communications were placed in a public file; many were not even reduced to writing. Although they do contend that these communications were secretive and unfair, appellants do not contend that the rulemaking was in any way corrupt.

Appellants make three arguments to support their allegations of lack of due process and unfairness. First, they maintain that this proceeding should have been conducted as a contested case pursuant to the Commission's Part II Rules, 20 DCRR § 2.1 *et seq.*, and not as a rulemaking. Second, appellants argue that they were afforded insufficient procedural protections. Finally, appellants claim that the manner in which the rulemaking was conducted, including the above-enumerated substantial *ex parte* communications, failed to meet the most minimal requirements of fundamental fairness.

A thorough examination of appellants' challenge is appropriate, given the "constant caution of courts to preserve administrative fair play when *ex parte* influence is

responsibly suggested." *Ruppert v. Washington,* 366 F.Supp. 686, 690 (D.D.C.1973), aff'd by order, 177 U.S.App.D.C. 270, 543 F.2d 417 (1976).

■ Appellants' first contention—that the Commission should have proceeded under its Part II Rules, 20 DCRR § 2.1 *et seq.* (contested case), rather than under Part III thereof, 20 DCRR § 3.1 *et seq.* (rulemaking) —need not detain us long. Precisely the same argument made by these parties about the same particular area to be zoned has been rejected previously by this court in *Citizens Association of Georgetown .v. Washington,* D.C.App., 291 A.2d 699 (1972) (*Georgetown I*). In relation to the zoning of this particular area, we there stated:

> The decision whether to amend the zoning classifications of the Waterfront area will depend upon the compilation and analysis of exhaustive information concerning the economic, environmental and aesthetic ramifications of various modes of development for the Waterfront. . .
> In short, a proceeding before the Zoning Commission on amendments relating to an area of a city lacks the specificity of subject matter and result, indicative of an adjudicatory proceeding. The proceeding is a quasi-legislative hearing conducted for the purpose of obtaining facts and information, and views of the public pertinent to the resolution of a policy decision. [*Id.* at 704–05.]

This *ratio decidendi* is consistent with other holdings of this court. *E. g., Schneider v. District of Columbia Zoning Commission,* D.C.App., 383 A.2d 324 (1978); *Dupont Circle Citizens Association v. District of Columbia Zoning Commission,* D.C.App., 343 A.2d 296 (1975) (en banc); *W. C. & A. N. Miller Development Co. v. District of Columbia Zoning Commission,* D.C.App., 340 A.2d 420 (1975) (en banc); *Chevy Chase Citizens Association v. District of Columbia Council,* D.C.App., 327 A.2d 310 (1974) (en banc). We hold that the Commission properly proceeded by rulemaking in his case, and that the procedural rights to which the parties were entitled must be evaluated in that context.

 The rights of the parties in a Zoning Commission rulemaking proceeding are defined by the Zoning Enabling Act, D.C. Code 1973 & D.C.Code 1978 Supp., § 5–413 *et seq.*, and the DCAPA. The Zoning Enabling Act provides that there shall be a public hearing on all amendments to the zoning maps and regulations at which "all interested persons shall be given a reasonable opportunity to be heard." D.C.Code 1973, § 5–415 & D.C.Code 1978 Supp., § 5–417. The DCAPA provides that prior to the adoption of any rule, there shall be afforded to interested persons "[an] opportunity to submit data and views either orally or in writing as may be specified in [the notice of the proposed rulemaking]." D.C.Code 1978 Supp., § 1–1505(a). In this respect, the DCAPA requirements as to notice and comment are closely analogous to the requirements of the Federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1977), for an informal rulemaking proceeding.[18] *See Capitol Hill Restoration Society v. Zoning Commission*, D.C.App., 287 A.2d 101, 104 (1972). Moreover, there is no requirement under the DCAPA that opponents of a rule be given the opportunity to cross-examine witnesses testifying favorably or to rebut evidence presented by proponents. Rulemakings differ in this regard from contested cases. *Compare* D.C.Code 1978 Supp., § 1–1505(a) *with* § 1–1509(b). It is not disputed that the proceedings utilized by the Commission were in conformity with the notice and hearing requirements of these statutes.

Appellants argue, however, that the DCAPA was meant only to prescribe minimum procedures and an agency may require more. *Georgetown II, supra*, 155 U.S. App.D.C. at 240 & n.34, 477 F.2d at 409, *citing* S.Rep.No. 1581, 90th Cong., 2d Sess. 9 (1968). Appellants thus have interpreted the Zoning Commission's Rules of Practice and Procedure, 20 DCRR § 3.1 *et seq.*, to support their position that a party to a Commission rulemaking proceeding is entitled to procedural rights substantially similar to those guaranteed in an adjudicatory proceeding. From a rule providing that the public hearing record not be closed for ten days,[19] 20 DCRR § 3.55, they infer a requirement that a rulemaking decision must be based exclusively on the hearing record. We note, however, that the Commission's rules provide unambiguously for a decision based exclusively on the hearing record when such is required, as in a contested case proceeding. *Compare* 20 DCRR § 2.7. *See also* D.C.Code 1978 Supp., § 1–1509(c). In our view, if the Commission had meant to provide further procedural rights it would have done so explicitly rather than by creating requirements by implication only. Moreover, "the Zoning Commission, operating in a quasi-legislative capacity, is not required to limit its decision making to evidence within the hearing record." *Gerstenfeld v. Jett*, 126 U.S.App.D.C. 119, 121, 374 F.2d 333, 335 (1967).

> In any rule making which is not done through [an on-the-record] proceeding, ex parte contacts are usually affirmatively desirable, for they help the administrators to know what affected parties want. The mainstay of procedure [in informal rulemaking] under . . . the Administrative Procedure Act is ex parte comments on tentative drafts of regulations. We want democratic influences on administration and the principal channel of such influences is ex parte contacts. . . Pressures and influences are used throughout our society, both in government and elsewhere, and a set of ethical principles should recognize that they are often not only not prohibited but affirmatively desirable. [K. Davis, Administra-

---

18. *Compare* 5 U.S.C. § 553(c) (1977). "After notice . . . the agency shall give interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments with or without opportunity for oral presentation." *See also Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n, supra* at 306–08 (Gallagher, J., concurring) (legislative-type Zoning Commission proceedings equivalent of Federal APA informal rulemaking).

19. Here the Commission extended the period that the record remained open for submissions to three weeks.

tive Law Treatise § 13.12 at 467–68 (1970 Supp.).]

The *ex parte* contacts which appellants attack violated no explicit or implicit procedural strictures. Because this was a rulemaking, therefore quasi-legislative in character, all the restraints of the DCAPA and the full range of due process protections necessary to an adversary adjudication are not applicable. In this regard it has been observed: "The more limited procedural safeguards in informal rulemaking are justified by its more wide-ranging functional emphasis on questions of law, policy and legislatively-conferred discretion rather than on the contested facts of an individual case." *Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 450, 564 F.2d 458, 471 (1977) (hereinafter *ACT*), *citing* 1 K. Davis, Administrative Law Treatise §§ 6.01 & 7.01, at 360–61 & 413 (1958). Rulemaking is predominantly a determination of policy. Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1307 (1975). Because the decision need not be " 'on the record,' the agency is free to be guided by externally developed policy considerations and thus to draw upon its accumulated expertise." Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking*, 87 Harv.L.Rev. 782, 784–85 (1974) (footnote omitted).

We now consider appellants contentions that the *ex parte* contacts undermined the essential fairness of the proceeding. The allegation of *ex parte* influence is "a most serious charge which cannot be swept away by [appellees'] assertion that the Commission, when acting in a quasi-legislative capacity, may consider *ex parte* matters even when submitted by [parties] having a major financial stake in the outcome." *Ruppert v. Washington, supra* at 689–90. There are important elements of a nonlegislative nature to the Commission's decisions, and there are important distinctions between our review of the Zoning Commission and our review of the acts of a legislature. *Georgetown II, supra* 155 U.S.App.D.C. at 239–40, 477 F.2d at 408–49. For "[u]nlike a legislature, the Zoning Commission is not directly responsible to the voters. . . . Accordingly, we cannot realistically expect the political process to act as a check on the Commission's actions." *Id.* at 240 n.28, 477 F.2d at 409 n.28.

This court has a duty, therefore, to assure that the proceedings before the Commission were essentially fair; for if the Commission violates its trust by in effect conducting a sham hearing, its actions are arbitrary. *Ruppert v. Washington, supra* at 690. *Cf. Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 384 A.2d 412 (1978) (decision not based upon substantial evidence is, perforce, arbitrary and capricious). It is in light of this standard that we evaluate the impact of the challenged communications.

Appellants claim that the mere fact of these secretive contacts invalidated the rulemaking. They also assert that this proceeding was not fundamentally fair because they were not notified or informed of the substance of the exchanges with developer-appellees thereby denying them an equal opportunity to contribute to the analysis and deliberations of the Commission's staff. They maintain that since the Commission's final decision was substantially influenced by the *ex parte* communications, the proceeding was vitiated as a sham.

In support of the argument that the rulemaking was unfair, appellants rely heavily upon *Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959), *cert. denied*, 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964). In that case, (a federal informal rulemaking proceeding involving the award of a television channel) after the record had been closed, the Commission received additional oral and written comments on a proposed policy which were not revealed to the opposition. The Federal Communications Commission contended that because the proceeding on review was a rulemaking, *ex parte* attempts to influence it could not invalidate the proceeding. The United States Court of Appeals held that since the proceeding "involved . . . resolution of conflicting private claims to a valuable privilege, . .

basic fairness requires such a proceeding to be carried on in the open. . . . Accordingly the private approaches to the members of the Commission vitiated its action and the proceeding must be reopened." *Id.* at 33, 269 F.2d at 224 (footnote omitted).

*Sangamon Valley* has spawned a number of progeny in the District of Columbia Circuit. Among the most recent, and most significant, is *Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 567 F.2d 9, *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), which involved the propriety of the procedures used in the formulation and adoption of pay cable television rules. Because the *ex parte* communications in *Home Box Office* were numerous, as appellants allege was so in the case at bar, the court was particularly concerned "that the final shaping of the rules . . may have been by compromise among the contending industry forces, rather than by exercise of the independent discretion in the public interest [vested in the agency]." *Home Box Office, supra* at 186, 567 F.2d at 53. The court stated "further, [that] if the Commission relied on these . . . private discussions in framing the final . . rules, then the elaborate public discussion in these dockets has been reduced to a sham." *Id.* at 187, 567 F.2d at 54. The existence of *ex parte* contacts between agency representatives and interested parties also renders the record incomplete as to the true basis of agency decision. This, in the court's view, would frustrate effective judicial review. Additionally, the nature of these off-the-record contacts exhibits the "inconsistency of secrecy with functional notions of fairness implicit in due process and with the ideal of reasoned decisionmaking on the merits which undergirds all of our administrative law." *Id.* at 189, 567 F.2d at 56.

After holding that the contacts invalidated the proceeding under its *Sangamon Valley* decision, the *Home Box Office* court set forth a rule prohibiting *ex parte* contacts.

The court further mandated that any *ex parte* contacts which occur once notice of proposed rulemaking issued should be summarized in writing and placed in the public file immediately after receipt so that interested parties may comment thereon. *Id.* at 190, 567 F.2d at 57.

As the trial court noted below, the case before us is distinguishable from *Home Box Office*. The instant case does not involve "competing claims to a valuable privilege" but is rather a policy decision upon the future development of an entire area of the city. In addition, as evidenced by its Statement of Reasons, in this case the Commission did not ignore the extensive public participation in the proceedings. Moreover, the Statement of Reasons and the voluminous record in this case furnish an adequate basis for effective judicial review.

Beyond the factual distinctions which exist between this case and *Home Box Office*, subsequent decisions have cast doubt on the continuing vitality of *Home Box Office*. In a concurrent decision, the District of Columbia Circuit limited the effect of *Home Box Office*.[20] *Action for Children's Television v. FCC, supra*. Relying upon the concurrence of Judge MacKinnon in *Home Box Office*, 185 U.S.App.D.C. at 194, 567 F.2d at 61, the *ACT* court refused to apply the rule limiting *ex parte* contacts to every rulemaking case. In particular, the court noted that such a rule should only be applied where the rulemaking proceedings involve "'competing claims to a valuable privilege,'" 183 U.S.App.D.C. at 456, 564 F.2d at 477 (citing *Home Box Office*, 185 U.S.App. D.C. at 194, 567 F.2d at 61 (MacKinnon, J., concurring specially)), because "[i]t is at that point where the potential for unfair advantage outweighs the practical burdens . . . that such a judicially conceived rule would place upon administrators." *Id.* 183 U.S.App.D.C. at 456, 564 F.2d at 477.

Furthermore, even the limited application of a judicial rule of procedure, such as that set forth in *Home Box Office* and *ACT*, to

---

**20.** The *ACT* court only held that it would not apply the broad proscription of *Home Box Office* retroactively "inasmuch as it constitutes a clear departure from established law when applied to informal rulemaking proceedings." 183 U.S.App.D.C. at 453, 564 F.2d at 474.

an administrative rulemaking is questionable. In reversing two judgments of the United States Court of Appeals for the District of Columbia Circuit, the Supreme Court articulated its "concern that they [the District of Columbia Circuit] had seriously misread or misapplied the statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Interpreting informal rulemaking requirements under § 553 of the Federal APA, to which the DCAPA is analogous, the Supreme Court stated:

> [G]enerally speaking this section of the Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rule-making procedures. Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare. [98 S.Ct. at 1202 (footnote omitted).]

> \* \* \* \* \* \*

> [T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances "the administrative agencies 'should be free to fashion their own rules of procedure and to pursue method of inquiry capable of permitting them to discharge their multitudinous duties.'" [*Id.* at 1211 (citations omitted).]

We adhere to the above-enunciated principles in this decision.

 We find an additional rationale to support our conclusion that this proceeding demonstrates sufficient fairness to avoid

characterization as a sham. It is a fundamental notion of administrative law that the final action of an agency must be similar enough to the original notice of the proposed rulemaking so that all interested parties are assured the opportunity to protect their interests by contributing to the administrative process. *Castle v. McLaughlin, supra.* In this case, the final action taken by the Commission was well within the necessarily similar bounds of the advertised proposals. *Aquino v. Tobriner, supra.* The trial court concluded that the *ex parte* contacts did not destroy the fairness of this rulemaking proceeding. "There is a voluminous record; the Commission has filed a statement of reasons which amply support its orders, and there is no evidence that the post-hearing contacts materially changed the zoning proposal initially presented at the public hearing. Affidavit of Steven E. Sher." *Citizens Association of Georgetown v. Zoning Commission of the District of Columbia, supra,* slip op. at 8. We agree.

 In conclusion, we reiterate: "[R]ule making is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making." *American Airlines, Inc. v. CAB,* 123 U.S. App.D.C. 310, 315, 359 F.2d 624, 629 (en banc), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). The Supreme Court has mandated that once a reviewing court has determined whether the agency complied with the procedures required by the relevant statutes: "The [appellate] court should . . . not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Vermont Yankee v. Natural Resources Defense Council, supra* 98 S.Ct. at 1214 & n.21. "Absent extraordinary circumstances, it is not proper for a reviewing court to prescribe the procedural format which an agency must use to explore a given set of issues." *Natural Resources Defense Council v. United States*

*Nuclear Regulatory Commission,* 178 U.S. App.D.C. 336, 347, 547 F.2d 633, 644 (1976), *rev'd and remanded sub nom.* *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

We have ascertained that the applicable statutes, rules and regulations were complied with by the Commission. As discussed above, under D.C.Code 1978 Supp., §§ 5–417 and 1–1505, appellants and other interested members of the public were entitled to a reasonable opportunity to comment and submit data in support of, or in opposition to, the regulations proposed. The Commission met this requirement by holding four days of hearings and by permitting a substantial period for submission of written comments.

■ Nevertheless, "[w]e should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Withrow v. Larkin,* 421 U.S. 35, 54, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 714 (1975). Based on a review of the entire record, we cannot say that the proceedings were so devoid of fundamental fairness that the hearings deprived appellants of constitutionally mandated procedural fairness.

We conclude that the Commission's treatment of the various issues and its extended explanation for the action taken set out in the Statement of Reasons show that appellants' participation in these proceedings was not just *pro forma* and that its submissions were not simply ignored. Although we are not persuaded that the events which transpired rose to the level of a violation of due process or fundamental fairness, the Commission nevertheless jeopardized "that appearance of fairness and impartiality [which] is probably of as great importance as its attainment, if the public is to have confidence in the judicial [or administrative] processes." *Jarrott v. Scrivener,* 225 F.Supp. 827, 834 (D.D.C.1964). However, while it may have been impolitic for the Commission not to invite further comment by appellants and to fail to make a part of the public record contacts between the staff and interested parties once the record was closed, we cannot say that the Commission violated appellants' rights under the DCAPA or due process by failing to do so.

*Affirmed.*

NEBEKER, Associate Judge, concurring in the result:

The majority of this court holds that the Zoning Commission need not zone in accordance with a comprehensive plan until such a plan is—if ever—adopted by the District of Columbia Council. The majority's opinion is based upon two supporting predicates. First, the Zoning Commission should zone "on a uniform and comprehensive basis," *Citizens Association of Georgetown v. Zoning Commission,* 155 U.S.App.D.C. 233, 238, 477 F.2d 402, 407 (1973) (*Georgetown II*). Second, the Zoning Commission should proceed to make zoning decisions independently under the philosophy of Home Rule. The error in each proposition is readily revealed by reference to the express mandate of Congress that Zoning Commission decisions must be based upon a standard more precise than the Commission's own amorphous notions of comprehensiveness. With the majority's rationale, therefore, resting upon faulty supports, I must disagree with the court, while concurring in the result.

Former section 5–414 of the D.C.Code provided, "[zoning] regulations shall be made in accordance with a comprehensive plan . . . ." Act of June 20, 1938, 52 Stat. 797, ch. 534, § 2. This section was derived from the Standard State Zoning Enabling Act, published by the U.S. Department of Commerce in 1926 and reprinted in ALI Model Land Development Code at 210–21 (Tent. Draft No. 1, 1968). The requirement that zoning be done "in accordance with a comprehensive plan" was included in this Standard Act, in the words of one of its principle drafters, because it is "comprehensiveness which puts the 'reason' into 'reasonableness' " in the zoning process. Bettman, *Constitutionality of Zoning,* 37 Harv.L.Rev. 834, 845 (1925).

By forcing local legislators to establish goals and to articulate a framework within which individual zoning decisions must

be made, the comprehensive plan provides a means for balancing and integrating public needs and individual property rights while providing "coherence and discipline in the pursuit of goals of public welfare which the whole municipal regulatory process is supposed to serve." [Comment, *Zoning Planning and the Scope of Judicial Review in Virginia*, 25 Am.U.L.Rev. 497, 498 (1976), *quoting* Haar, *In Accordance With a Comprehensive Plan*, 68 Harv.L.Rev. 1154 (1955).] A comprehensive plan, moreover, would provide a standard by which we, as a reviewing court, might judge the conformance of individual zoning decisions to the legislative goals and policies. Without such a standard, we are left to review each decision in a vacuum and to give to each a presumption of quasi-legislative validity, which should rightly inhere only in formally approved declarations of zoning policy.

In 1952, Congress created the National Capital Planning Commission (NCPC) "as the central planning agency for the Federal and District Governments . . . ." Act of July 19, 1952, 66 Stat. 782, ch. 494, § 1 (formerly codified at D.C.Code 1973, § 1–1002(a)). The congressional intent in establishing the NCPC was "to secure comprehensive planning for the physical development of the National Capital and its environs . . . ." *Id.* (formerly codified at D.C.Code 1973, § 1–1001(a)). After the NCPC developed such a plan, the United States Court of Appeals for the District of Columbia Circuit, in its *Georgetown II* decision, held that the product of the NCPC's "comprehensive planning" efforts was not the "comprehensive plan" in accordance with which the Zoning Commission was required to zone. The Court of Appeals reached this conclusion by noting that the predecessor to the NCPC was in existence before the zoning enabling legislation was enacted and that "[t]here is no indication in the history of the 1938 Zoning Act . . . that Congress had any intention" of binding the Zoning Commission to the NCPC plans. 155 U.S.App.D.C. at 238 n.16, 477 F.2d at 407 n.16. Therefore, the court held, the zoning decisions of the Zoning Commis-

sion—not those of the NCPC—were "entitled to a presumption of validity." *Id.* at 238, 477 F.2d at 407.

That this decision was supported only by an absence of express Congressional intent and that it was anti-thetical to the requirement that the Zoning Commission zone "in accordance with a comprehensive plan," including a framework for a standard for review, is, however, of no great moment. *Georgetown II* was never binding upon this court, *M.A.P. v. Ryan*, D.C.App., 285 A.2d 310 (1971) (en banc). More importantly, however, that decision has been legislatively overruled.

Congress, well aware (as the majority concedes) of the *Georgetown II* decision, recently enacted a new scheme of zoning and planning for the District. Under this scheme, the Zoning Commission is no longer required to zone "in accordance with a comprehensive plan" as long as its decisions are "not be inconsistent with *the* comprehensive plan for the National Capital . . . ." D.C.Code 1978 Supp., § 5–414 (emphasis added). Two changes made in this legislation are pertinent. First, upon review of zoning decisions, consistency with the comprehensive plan need not be shown: the burden rests upon the party attempting to show an inconsistency between the decision of the Zoning Commission and the comprehensive plan. Second, the change from the indefinite to the definite article modifying "comprehensive plan" doubtlessly means that Congress intended that there exist a comprehensive plan, against which the propriety of a zoning decision might be tested, rather than the ephemeral and unreviewable concepts presently employed.

The comprehensive plan now mandated by Congress has two components: First, those elements of the plan bearing on primarily federal concerns, which are to be developed and adopted by the NCPC, and second, those elements of the plan affecting purely District interests, which are to be prepared by the Mayor, approved by the Council, and submitted to the NCPC for adoption. D.C.Code 1978 Supp., §§ 1–

1004(a) and –1002(a)(3), respectively. The District elements of the plan, however, would become effective only if the NCPC does not certify within sixty days that the District elements will have a "negative impact on the interests or functions of the Federal Establishment in the National Capital." D.C.Code 1973, § 1–1002(a)(4)(A). Thus, Congress attempted to insure that the District, in spite of its new Home Rule powers, would not encroach upon legitimate federal interests and functions. *Compare* D.C.Code 1978 Supp., § 1–1002(a)(4)(A) *with* § 1–1004(a) (lack of agreement between NCPC and the National Capital Regional Planning Council does not effect comprehensive plan).

The majority today turns the Congressionally enacted scheme on its head. Arguing that the overriding Congressional intent was to invest the District Government with maximal powers of Home Rule, the majority holds, in effect, that the federal interests, represented by NCPC, shall have no power to veto District incursions. This result is achieved by granting the Zoning Commission the power to continue to "zone on a uniform and comprehensive basis" until the District elements of the plan are developed and implemented—which may well never occur.

Zoning decisions made in the absence of a comprehensive plan can bring about the existence of an entirely new, de facto "comprehensive plan" which has not been submitted by the Mayor to the Council, approved by the Council, nor submitted by the Council to NCPC. Moreover, such a scheme would not be subject to NCPC veto for its negative impact upon federal interests. (The "comment and review" powers of NCPC under D.C.Code 1978 Supp., § 5–417(a)(2), are not as great as the NCPC veto power under D.C.Code 1978 Supp., § 1–1002(a)(4)(A).) Finally, as previously noted, such a shadowy standard does not provide a useable backdrop against which the advisability of zoning decisions may be ascertained.

The majority's decision arises out of what it perceives to be a dilemma. The current ("Red Book") NCPC plan is, admittedly, incomplete. The Mayor and the Council have not yet made any headway in developing the District elements of the comprehensive plan. Since Congress has provided no guidance as to what plan, if any, governs pending adoption of the new comprehensive plan, the majority reasons that the court cannot call a halt to all zoning until the District decides to adopt its elements of the plan. The proper resolution, the majority concludes, is to allow the Zoning Commission to continue until new standards are adopted.

I am not certain that a zoning moratorium would not serve the very useful purpose of assuring prompt compliance with the Congressional mandate that the District adopt a comprehensive plan so that the Commission's adoption (and our review) of zoning decisions would be informed by definite legislative expressions of policy. But such a course would be somewhat drastic. A reasonable alternative, which is both proper and feasible, is found within the covers of the Red Book plan itself. This method of resolving the majority's dilemma is merely the realization of the new Congressional directive of conformance to *the* zoning plan.

Congress did, as the majority notes, give the District a wealth of new powers under the Home Rule legislation. Among these powers is one which was eagerly sought: the power to control land use without conformance to the Red Book plan insofar as that plan might affect purely District interests. Congress, therefore, gave the District the power to adopt District elements of the plan, subject only to veto by NCPC where a District element has a negative impact upon federal interests. But the District's power to control its own destiny through this process does not mean that it may, by failing to exercise this power, let devolve upon the Zoning Commission the same or even greater powers. Had this been the congressional intent, Congress, knowing well the existence of the NCPC (Red Book) plan, could have directed that the District and NCPC develop a new plan, staying the mandate of

section 5–414 until that plan had been developed. Instead, it allowed the District ample time between December 24, 1973, the enactment date of the Home Rule legislation, and July 1, 1974, the effective date of the planning provisions, to begin the development of the District elements of the plan. It also permitted another six months (until January 2, 1975) for the District to propose to NCPC any District elements which might, because of impending development (like that along the Georgetown waterfront), be necessary to its zoning powers. Congress, in my view, gave the District the power to zone to its own preferences if only it would express them in a meaningful (*i. e.,* responsible, legislative) way. But where the District has not done so, I find no hint that Congress intended to permit the Home Rule powers to devolve upon the Zoning Commission by default. The only alternative is the comprehensive plan which the District has not, by legislative act, altered: the Red Book plan.

Even where the District has not exercised its Home Rule powers to modify the Red Book plan, however, Congress permitted the Zoning Commission to continue to zone, for the Commission is not permitted to zone only when the zoning decision is "in accordance with" the Red Book plan. Such a power would be limited by the incompleteness of the Red Book plan. Rather, the Commission may continue to zone as long as its decisions are *not inconsistent* with the Red Book plan. Where the plan is silent, the Commission is free to zone in accordance with its own conceptions. Where the plan is vague, ambivalent or ambiguous, it would be difficult to prove inconsistence between it and a zoning decision. More importantly for the instant case, the Zoning Commission is, I would hold, under no obligation to take affirmative steps to *conform* existing zoning maps and regulations to the Red Book plan—as long as it does nothing to create nonconformance. That is enough to decide this case.

The appellant commenced the instant case on January 2, 1975, the effective date of present code section 5–414, by requesting mandatory and injunctive relief to require *rezoning* of the Georgetown waterfront, alleging that, as a result of the new code provision against inconsistency, the Zoning Commission was under an affirmative duty to undo what it had done prior thereto and that the construction then (and now) in progress under the new zoning should be enjoined. Appellants rely, in part, upon the statement in *Capitol Hill Restoration Society v. Zoning Commission,* D.C.App., 380 A.2d 174, 177 n.2 (1977), that "[o]rdinarily the court is to apply the law existing at the time of its decision." The Red Book plan, therefore, it is argued, mandates the invalidation of the Zoning Commission decisions which, although adopted before section 5–414 became effective, are now inconsistent with that plan.

But appellants' arguments are not decisive. First, with respect to the request for mandatory relief, it does not appear that appellants, after the effective date of section 5–414, petitioned the Commission for a new rulemaking proceeding by which the zoning maps might have been amended to provide consistency with the Red Book plan. *See* D.C.Code 1978 Supp., § 1–1505(b). Thus, appellants appear to have failed to exhaust their administrative remedies. Yet even assuming exhaustion of administrative remedies, this court lacks the power to mandate that the Commission "promulgate," amend, or repeal any rule pursuant to a petition therefor . . . . D.C.Code 1978 Supp., § 1–1505(b).

Second, and more importantly, the rule that "[o]rdinarily, a court is to apply the law existing at the time of its decision" is inapplicable to the facts of the instant case. The rule was recently applied in *Cort v. Ash,* 422 U.S. 66, 76–77, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), where the Court denied private injunctive relief as to possible future violations of a federal law because new legislation, enacted after the trial court's decision, made it clear that private remedies were unavailable to those litigants. Thus, the intervening law was applied to deny injunctive relief for violations which had not yet occurred. Similarly, the rule applies, where the intervening legislation

merely states what the law should have been at the time of decision, so that it is retroactively applied. *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (equitable award of attorney's fees by District Court vindicated by subsequent legislation specifically permitting such award).

Application of the rule to the facts of *Capitol Hill Restoration Society* did not exceed these bounds, for its application did not "result in manifest injustice" (*Bradley, supra* at 711, 94 S.Ct. 2006) to the party seeking application of the prior law—*i. e.,* the Commission, whose decision was affirmed. In the instant case, on the other hand, the Commission's decision was made prior to the effective date of the law (section 5–414) which appellants would have us apply in order to invalidate the Commission's decision—an application which would cause irreparable harm to the intervenors here, whose reliance upon the prior decision at that time led to the expenditure of massive amounts of time, energy and money in their construction projects. At least in the context of appellants' invocations of our equitable powers, there is every reason to apply the law as it existed at the time of the Commission's decision.

Finally, a word needs to be said concerning the applicability of *Georgetown II* to the instant case. *Georgetown II* is the only extant judicial interpretation of the meaning of the former Congressional mandate that the Commission zone "in accordance with a comprehensive plan." Although I believe that case to have been incorrectly decided, and although I abhor the effort to apply the reasoning of that case to the new Congressional mandate that the Commission's decisions "not be inconsistent with" the Red Book plan, equitable considerations must temper my view. Intervenors relied upon *Georgetown II.* To cause them to uproot at this time would be inequitable. Nevertheless, in light of the new Congressional mandate that a particular compre-

hensive plan be developed and followed, the *Georgetown II* interpretation of the former Congressional mandate should be discarded in the future.

In light of the most recent Congressional mandate that the Zoning Commission's decision "not be inconsistent" with *the* comprehensive zoning plan, *i. e.,* the Red Book plan, I conclude that until the District of Columbia, through its Mayor and Council submits its zoning proposals to the NCPC for review, the District's Zoning Commission is to defer in the resolution of zoning matters to the Red Book plan. The Zoning Commission should not be permitted, as the majority would allow, to disregard a Congressional mandate on the pretense of exercising their Home Rule powers. Due to equitable considerations, I concur in the result reached by the majority, but I must diametrically differ with the rationale employed in reaching that decision.

HARRIS, Associate Judge, concurring in part and dissenting in part:

Like my Brother NEBEKER, whose views I endorse, I am unable to agree fully with the position of the majority in this case. Therefore, I respectfully dissent in part.

My views may be simply stated; they reflect the approach a division of this court unanimously adopted in *Capitol Hill Restoration Society v. Zoning Commission,* D.C. App., 380 A.2d 174 (1977) (*Capitol Hill II*). In my opinion, until a new comprehensive plan is adopted by the District government and the National Capital Planning Commission (NCPC) pursuant to § 203(a) of the Home Rule Act [D.C.Code 1978 Supp., § 1–1002(a)(4)(D)], the so-called "Red Book" is the plan which is applicable to zoning determinations in the District.[1]

While I concur in the majority's statement that "pursuant to the holding of *Georgetown II* [*Citizens Association of Georgetown v. Zoning Commission,* 155 U.S. App.D.C. 233, 477 F.2d 402 (1973)] . . . .

---

1. I refer, as does the majority, to the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat.

774 (1973) (reprinted in D.C.Code 1978 Supp., at xi-xxxvii), as the "Home Rule Act."

the statutory provision prior to the Home Rule Act referring to a 'comprehensive plan' did not require compliance with the 'Red Book' plan" (majority op. at 1032), I would add that *Georgetown II* never constituted binding precedent in this court.[2] *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

I am—as would anyone be—in full agreement with the majority that in construing a statute we must focus on, and give effect to, legislative intent, and we must grant legislative words their natural meaning [majority op. at 1032, *citing Rosenberg v. United States,* D.C.App., 297 A.2d 763, 765 (1972)]. However, the conclusions I draw from the legislative history differ significantly from the conclusions of the majority.

Initially, I have no quarrel with the majority's conclusion that the comprehensive plan for the National Capital referred to in § 492(b)(1) of the Home Rule Act [D.C.Code 1978 Supp., § 5–414] is the jointly prepared and published plan outlined both in the majority opinion and in *Capitol Hill II. House Comm. on the District of Columbia,* 93d Cong., 2d Sess., 2 Home Rule for the District of Columbia 1973–1974 at 1182 (Comm.Print 1974) (Full Committee Markup of H.R. 9056, Fri., July 27, 1973) (hereinafter referred to as Home Rule). There is no need to describe that plan in detail again. I emphasize only that Congress explicitly has set forth the interrelationships which are to exist in the formulation of a comprehensive plan between the Mayor, the City Council, the Zoning Commission, and the NCPC. The basic thrust of the legislation is the creation of a dichotomy of planning functions between the Mayor and the Council (for District elements) and the NCPC (for federal interests). The NCPC has been created as the central planning agency for the federal government in the National Capital. D.C.Code 1978 Supp., § 1–1002(a)(1). The Mayor, on the other hand, has been made responsible for coordinating the planning activities of the District government. D.C.Code 1978 Supp.,

§ 1–1002(a)(2). As the majority points out, the Mayor's planning responsibilities do not extend to federal projects in the District. Additionally, procedures have been created which allow for the reconciliation of District and federal interests. Following submission by the Mayor of each District element of the plan to the City Council for adoption (and such adoption must be preceded by public hearings), the elements must be submitted to the NCPC for review and comment regarding the impact of each element on the Federal Establishment. The NCPC has the ultimate authority to veto any proposed District element which it ascertains will have a negative impact on the interests or functions of the Federal Establishment.

The implementation of this legislation in the form of a newly-developed comprehensive plan necessarily is a time-consuming process. The legislative history sheds no light, however, on the question of what plan Congress intended to have applied during the period in which a new comprehensive plan was being prepared and adopted. Indeed, the legislature failed even to make clear whether it intended for any plan to apply during this interim period, or whether it intended instead to impose a temporary moratorium on new zoning in the District pending the completion of a new comprehensive plan. In fact, the legislative history, as portrayed by the following exchange, indicates that the issue arose once but was never resolved.

MR. [BROCK] ADAMS. When would you want the National Capital Planning Commission provisions and the Zoning Commission provisions to become effective?

MR. FRASER. Could we explore that for a moment?

MR. ADAMS. Let's do.

MR. FRASER. When this passes, we are not perpetuating something which already exists. We are doing something new. . . .

MR. ADAMS. That is correct.

2. The "Red Book" plan was adopted in 1968 by the NCPC, which, as the majority notes, formerly was charged with preparing a comprehensive land use plan for the District.

MR. DANIELS. Are you talking about the NCPC?

MR. FRASER. Yes.

MR. DANIELS. The difference here is you are leaving the NCPC in place exactly where it is and taking some of the functions and splitting them up and getting into the District Government. * * The NCPC will continue to exist as a federal planning operation.

 \* \* \* \* \* \*

MR. FAUNTROY. * * * It is saying that NCPC, you are a Federal agency, however, from this day forward you will not do the following things.

MR. ADAMS. What you want is an effective date for that.

MR. FRASER. Let me ask one question. [1 Home Rule, *supra,* at 292 (May 21, 1973).]

The discussion then went on to another topic, and the issue of an effective date (with a concomitant resolution as to what should control for the interim period) for the new provisions remained undecided.

We thus are placed in the difficult position of determining, absent clear guidance from Congress, what plan, if any, to apply to zoning in the District during the hiatus between the adoption of the relevant legislation and the creation of a new comprehensive plan.

My colleagues conclude that Congress did not indicate that the Red Book should apply in the interim, and that the application of the Red Book plan would be inconsistent with Home Rule for the District. Accordingly, they conclude that the holding of *Georgetown II* should remain in effect until a new comprehensive plan is adopted.

This approach has certain practical benefits. Obviously, the simplest solution would be to allow zoning to continue in accordance with present procedures until the new plan is sufficiently formulated to be put into effect. There are, however, three serious problems with this approach.

First, we have no indication that Congress intended such a result. The language of the Home Rule Act's savings clause

[§ 717(b)], upon which the majority relies, seems particularly inapposite in light of the earlier indicated, but never realized, Congressional desire to designate a specific effective date for the implementation of the new comprehensive plan. Congress unquestionably did not intend for the District to remain without a comprehensive plan for an undetermined, and possibly quite lengthy, time period. (Although the District has had the authority to adopt new elements and amendments to the comprehensive plan since July 1, 1974, to my knowledge, only one element had been submitted as of November 17, 1977.) Furthermore, the legislative history is replete with references to the *Georgetown II* case, and there can be no doubt but that a major motivating factor behind Congress' decision to amend § 5–414 of the Code was its desire to overrule *Georgetown II.* In light of this background, I do not understand how the majority can espouse a solution which permits a situation which Congress obviously deplored to continue to exist indefinitely. The decision handed down today means that for some time to come, zoning in the District will not be conducted in accordance with any comprehensive plan despite the express will of Congress that "[z]oning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the National Capital . . . ." D.C.Code 1978 Supp., § 5–414. I cannot concur in such an anomalous result.

Second, the approach the majority has adopted cannot be validly defended on the ground that it is consistent with the Home Rule Act. In my opinion, it is not. The solution the majority provides allows for the retention of zoning authority in the District government rather than in the NCPC. Congress, however, has specified certain procedures which provide not only for a separation of planning authority between the NCPC and the District government, but which also delineate how planning authority within the District government is distributed among and between the Mayor, the Council, and the Zoning Com-

mission. The majority's holding interferes with the NCPC's exercise of the authority which Congress clearly has indicated it should have, including the significant veto power with which it has been vested. Today's decision allows the District government to continue zoning in a manner inconsistent with the express procedures Congress has established. I can find no support in logic or in the legislative history for such a result.

Finally, the majority's ruling in all probability sounds the death knell for any hope which may exist for the early adoption of a comprehensive plan. This decision will not help to prompt the adoption of a written and published plan, as specified by Congress. Instead, it will not only condone continued zoning in the District on what Congress implicitly has viewed as an undesirable ad hoc basis; it also will discourage the adoption of a new comprehensive plan, for the majority today judicially legislates to give the District greater freedom from sound zoning limitations than Congress did in passing the Home Rule Act.[3]

I recognize that Congress has failed to provide a clearcut answer to this troublesome issue. Under these circumstances, we must interpret Congressional intent as best we can. While I agree with appellees that the Red Book is inadequate as a meaningful long-term zoning guidepost, it does, nevertheless, provide some published guidelines for zoning in the District. It is, in fact, a plan rather than merely an amorphous concept. As such, it makes possible more meaningful zoning decisions and, correlatively, more meaningful appellate review. For these reasons I concluded in *Capitol Hill II,* and I am still of the belief, that the Zoning Commission should obtain whatever guidance it can from the Red Book until a new comprehensive plan is adopted. To the extent that the Red Book is contrary to the planning preferences of the District authorities, those authorities may adopt (and since July 1974 they have been empowered to

adopt) new elements and amendments more consistent with their views (subject, of course, to the appropriate Congressionally ordained participation by the NCPC). Until that time (unless Congress finds it necessary to designate a specific deadline for the formulation of a new plan), I believe the Zoning Commission and this court should be guided by the only published plan which already is in existence.

---

**3.** At oral argument in this case, counsel for appellant observed that the result which has been adopted by the majority would effectively rewrite § 5–414 of the Code to provide that "zoning . . . shall not be inconsistent with zoning." His observation is quite valid.